PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name  LOCKHART ERIC

      (Last)                 (First)            (Initial)

Prisoner Number  V-17246

Institutional Address  KERN VALLEY STATE PRISON, DELANO, CA. 93216

==================================================================

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ERIC LOCKHART

Full Name of Petitioner

           Case No.  **CV 08 2186**
           (To be provided by the clerk of court)

vs.

TONY HEDGPETH - (WARDEN)

Name of Respondent
(Warden or jailor)

PETITION FOR A WRIT OF HABEAS CORPUS

**(PR)**

**E-filing**

==================================================================

Read Comments Carefully Before Filling In

When and Where to File

    You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

## Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

## A.   INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.   What sentence are you challenging in this petition?

(a)   Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

| Alameda County Superior Court | Alameda County, California |
|---|---|
| Court | Location |

(b)   Case number, if known  __139400-B__

(c)   Date and terms of sentence  __12-12-03   Life w/o Parole__

(d)   Are you now in custody serving this term?  (Custody means being in jail, on parole or probation, etc.)  Yes __X__   No ____

| Where?  __Kern Valley State Prison__ | Delano, California |
|---|---|
| (Name of Institution) | (Address) |

2.   For what crime were you given this sentence?  (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known.  If you are challenging more than one sentence, you should file a different petition for each sentence.)

__Murder with Special Circumstances.__

3.   Did you have any of the following?

Arraignment:  Yes __X__  No ____   Preliminary Hearing:  Yes __X__  No ____

Motion to Suppress:  Yes ____  No __X__

2

4.    How did you plead?

Guilty _____    Not Guilty __X__    Nolo Contendere _____

Any other plea (specify) _____

    5.    If you went to trial, what kind of trial did you have?

Jury __X__    Judge alone _____    Judge alone on a transcript _____

    6.    Did you testify at your trial?    Yes _____    No __X__

    7.    Did you have an attorney at the following proceedings:

(a)    Arraignment    Yes __X__    No _____
(b)    Preliminary hearing        Yes __X__    No _____
(c)    Time of plea    Yes __X__    No _____
(d)    Trial        Yes __X__    No _____
(e)    Sentencing    Yes __X__    No _____
(f)    Appeal    Yes __X__    No _____
(g)    Other post-conviction proceeding    Yes _____    No __X__

    8.    Did you appeal your conviction?    Yes __X__    No _____

      (a)    If you did, to what court(s) did you appeal?

Court of Appeal    Yes __X__    No _____       5-10-06    Affirmance
                                          (Year)    (Result)

Supreme Court of
California    Yes __X__    No _____       8-23-06    Denial
                                            (Year)    (Result)

Any other court    Yes _____    No __X__    _____
                                           (Year)    (Result)

    (b)    If you appealed, were the grounds the same as those
that you are raising in this petition?    Yes __X__    No _____

    (c)    Was there an opinion?    Yes __X__    No _____

    (d)    Did you seek permission to file a late appeal under
Rule 31(a)?    Yes _____    No __X__

      If you did, give the name of the court and the result:

_____

    9.    Other than appeals, have you previously filed any petitions,
applications or motions with respect to this conviction in any court,
state or federal?    Yes. __X__    No _____

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

    (a) If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.  Name of Court  California Supreme Court (S155456)

    Type of Proceeding  Habeas Corpus

    Grounds raised (Be brief but specific):

    a.    Same as those raised in this petition.

    b.    _____

    c.    _____

    d.    _____

    Result  DENIED                Date of Result  JAN 30, 2008

II. Name of Court  California Court of Appeal—First District

    Type of Proceeding  Habeas Corpus

    Grounds raised (Be brief but specific):

    a.    Same as those raised in this petition.

    b.    _____

    c.    _____

    d.    _____

    Result  Denial                Date of Result  8-3=07

III. Name of Court  Alameda County Superior Court

    Type of Proceeding  Habeas Corpus

    Grounds raised (Be brief but specific):

    a.    Same as those raised in this petition.

b. _____

c. _____

d. _____

Result __Denial_____    Date of Result __5=8-07____

      (b)  Is any petition, appeal or other post-conviction
proceeding now pending in any court?    Yes __X__    No _____

California Supreme Court - San Francisco, California
_____
               (Name and location of court)

B.  GROUNDS FOR RELIEF

    State briefly every reason that you believe you are being
confined unlawfully.  Give facts to support each claim.  For example,
what legal right or privilege were you denied?  What happened?  Who
made the error?  Avoid legal arguments with numerous case citations.
Attach extra paper if you need more space.  Answer the same questions
for each claim.

    Note:  You must present ALL your claims in your first federal
habeas petition.  Subsequent petitions may be dismissed without review
on the merits.  28 U.S.C. § 2244(b); McCleskey v. Zant, 499 U.S. 467,
111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

    Claim One: __See attached pages._____

_____

    Supporting Facts: _____

_____

_____

_____

    Claim Two: _____

_____

    Supporting Facts: _____

_____

_____

_____

GROUND ONE-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO CONFRONT
WITNESSES WAS VIOLATED(see attached memorandum of law at 6-9).

Over defense objection, the prosecution introduced an out of court
confession by codefendant Harris(RT-773-74).   The confession also
incriminated Petitioner by suggesting Harris had an accomplice who
planned the robbery and shot the victim.   The statement was test-
imonial, was not subjected to cross-examination, and Harris was
not unavailable for cross-examination(Crawford-v-Washington 124
S.Ct. 1354-2004).   The statement was argued as incriminating to
Petitioner(RT-39,46-48,956-58).

GROUND TWO-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO CONFRONT
WITNESSES WAS VIOLATED(see attached memo. of law at 10-17).

Harris' aforementioned statement (ground one) also violated "Bruton
-v-U.S."(391 U.S. 123-1968).   The statement was facially incrimin-
ating to Petitioner as it implied his alleged existence, planning
of the robbery, and shooting of the victim(RT-773-74).   It was used
against Petitioner by the attorneys(RT-39,46-48,956-58,1033,1035,
1000,1003-04).   Moreover, a limiting instruction was undermined by
the attorneys(id) and was given too late to prevent prejudice(RT-
773-74,1056).

GROUND THREE-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE
PROCESS AND EFFECTIVE COUNSEL WERE VIOLATED(see attached memo. of
law at 18-27).

The prosecution introduced evidence threats had been made against
witnesses Savage and Boatley(RT-448-52,456,531,281,967).   There was
no evidence Petitioner was aware of, or authorized, the threats
(RT-503).   The prosecutor capitalized on this evidence in argument
(RT-991-92,995,1001,1036).   Codefendant Harris' attorney argued
Petitioner had authorized the threats(RT-994,1000).   The jury was
never instructed the evidence was relevant only to witness credi-
bility and not to consciousness of guilt.   Counsel did not request
such instruction.

GROUND FOUR-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS
WAS VIOLATED BY INSUFFICIENT EVIDENCE(see att. memo. of law at 28-35).

There was insufficient evidence Petitioner killed the robbery vic-
tim, intended to kill, or was recklessly indifferent to human life
within the meaning of the special circumstance. The evidence in-
dicated codefendant Harris shot the victim(RT-256-57,711-12,562-63).
There was no evidence Petitioner (1) was armed, (2) knew Harris was
armed or intended to kill, or (3) directed or encouraged Harris to
kill.  As to reckless indifference, there is no evidence Petitioner
(1) knew Brown had been shot or could have helped after he was shot,
(2) came into contact with Brown, (3) knew Harris was armed, or (4)
had an opportunity to prevent the shooting or was unsuprised when
it occurred.

GROUND FIVE-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE PRO-
CESS WAS VIOLATED BY INSUFFICIENT EVIDENCE(see att. memo. of law at
36-40).

There was insufficient evidence of felony-murder liability.  There
was no evidence (1) Petitioner himself shot the victim or (2) (for
purposes of accomplice liability) of a causative link between the
killing and any robbery-related acts.  There is no evidence Brown
resisted the robbery and had to be shot, or that the gun was being
used to facilitate robbery or escape therefrom.  There was in-
sufficient evidence of malice-murder liability.  There was no evi-
dence Petitioner intended to kill or did so with premeditation and
deliberation.

GROUND SIX-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PRO-
CESS WAS VIOLATED BY INSUFFICIENT EVIDENCE(see att. memo. of law
41-42).

The felony-murder special circumstance required proof the killing
was intended to advance or facilitate the robbery or the escape
therefrom(CALJIC 8.80.1).  As the record is silent on any relation-

ship between the killing and the robbery, there is no evidence of
the requisite intent.

GROUND SEVEN-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO EFFECTIVE
COUNSEL WAS VIOLATED(see att. memo. of law at 43-47).

Counsel failed to argue to the jury the ways in which the murder
and special circumstance elements had not been proven(see grounds
four, five and six). Even if constitutionally sufficient, the
sparse evidence provided a substantial basis for acquittal.

GROUND EIGHT-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE
PROCESS AND EFFECTIVE COUNSEL WERE VIOLATED BY SUGGESTIVE IDENTIFI-
CATION PROCEDURES(see att. memo. of law at 48-57).

Petitioner's conviction was based on the identification testimony
of Enzore Savage. Within nine days of the crime, Savage was unable
to identify Petitioner in a line-up(RT-270,830; att.ex. (attached
exhibit) A-2-3,5). After subsequently learning from a newscast
Petitioner had been arrested in this case, Savage called and asked
investigators if Petitioner had been in the line-up(att.ex. A-5;
RT-786-87). He also indicated his ability to identify Petitioner
was not certain(id). Savage was subsequently allowed to see Pet-
itioner (1) in custody along with codefendant Harris, whom Savage
had already identified(2PHT-55-56[preliminary hearing transcript])
and (2) at the defense table in identifiable jail clothes. It was
then, three months after the crime, that Savage identified Petitioner
(1PHT-119-20). That identification was introduced at trial as was
his trial identification(RT-254,255). Savage saw the suspect full
face for only about five seconds from 14-15 feet away(RT-287,250-
55; 1PHT-88,100,103), payed more attention to the suspect identified
as Harris(RT-253-83; 1PHT-9697), and gave only a general description
(att.ex. D at 4; att.ex. B at 6). Savage may have confused his
memory of Petitioner from years before with that of the actual
suspect(RT-260,785-87). Trial Counsel failed to move for suppres-
sion of the identifications.

GROUND NINE-PETITIONER'S SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL
WAS VIOLATED(see att. memo. of law at 58-63).

Trial Counsel failed to impeach Savage by cross-examining Savage
and Seargent Medieros (1) about Savage's call to investigators to
ask if Petitioner were in the line-up, (2) about his expressed un-
certainty of his ability to identify Petitioner(RT-786-87; att.ex.
A-5), (3) about Savage seeing Petitioner dressed in jail clothes
and at the defense table when Savage identified him at the prelim-
inary hearing(1PHT-119-20), (4) about Savage seeing Petitioner in
court with Harris, whom Savage had already identified, before
Savage identified Petitioner(2PHT-55-56), and (5) about Savage
learning from a news broadcast, before he identified Petitioner,
that Petitioner had been arrested for Brown's murder(att. ex. A-5).
The foregoing cross-examination could have led the jury to conclude
Savage's identification resulted from suggestion, rather than his
observations of the suspect.


GROUND TEN-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS,
IMPARTIAL JURY, JURY TRIAL, EQUAL PROTECTION, AND EFFECTIVE COUNSEL
WERE VIOLATED.

Petitioner's rights were violated by the presence of biased jurors
on the panel.  Trial Counsel failed to challenge biased jurors and
to adequately question jurors to uncover bias.  The prosecutor used
peremptory challenges to exclude black and minority jurors.  Trial
Counsel failed to object on the basis of "Batson-v-Kentucky."
Appellate Counsel failed (1) to challenge the juror panel as biased
or to raise the prosecutor's "Batson" violations, or (2) to order
preparation of the voir dire transcript and juror questionnaires
to investigate possible bias and "Batson" claims.

GROUND ELEVEN-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE
PROCESS, EQUAL PROTECTION WERE VIOLATED BY DENIAL OF HIS REQUEST
FOR COURT TRANSCRIPTS AND RECORDS.

Petitioner filed a habeas petition in the state courts containing related claims of juror bias, "Batson" error, and ineffective trial and appellate counsel. Petitioner also filed a motion for preparation and provision of the jury voir dire transcripts and jury questionnaires. Such were needed to prove the constitutional claims but were not provided to Petitioner by appellate counsel or the state courts on direct appeal. The state habeas courts denied the motion for transcripts and questionnaires.

Claim Three: _____

_____

Supporting Facts: _____

_____

_____

_____

   If any of these grounds was not previously presented to any other
court, state briefly which grounds were not presented and why:

_____

_____

_____

_____

   List, by name and citation only, any cases that you think are
close factually to yours so that they are an example of the error you
believe occurred in your case.  Do not discuss the holding or
reasoning of these cases:

   See attached legal memorandum. _____

_____

_____

   Do you have an attorney for this petition?   Yes _____  No __X__
If you do, give the name and address of your attorney:

_____

   WHEREFORE, petitioner prays that the Court grant petitioner
relief to which s/he may be entitled in this proceeding.  I verify
under penalty of perjury that the foregoing is true and correct.

Executed c. /  _APRIL 16 2008_ ____ ~~Eric Lockhart~~ _____
                 Date                      Signature of Petitioner

(rev. 5/96)

6

TABLE OF CONTENTS

Statement of the Case                                              1

Evidence Presented at Trial                                        1


Ground One-Petitioner's Federal Constitutional Right to Confront

          Witnesses was Violated                                   6


Ground Two-Petitioner's Federal Constitutional Right to Confront

          Witnesses was Violated                                  10

     A. Robbery and Murder                                        16

     B. Felony-Murder Special Circumstance                        17


Ground Three-Petitioner's Federal Constitutional Rights to Due

          Process and Effective Counsel were Violated             18


Ground Four-Petitioner's Federal Constitutional Right to Due

          Process was Violated by Insufficient Evidence

          (Special circumstances)                                 28

     a. Actual Killer                                             28

     b. Intent to Kill                                            30

     c. Reckless Indifference                                     31


Ground Five-Petitioner's Federal Constitutional Right to Due

          Process was Violated by Insufficient Evidence

          (Substantive Offense)                                  36

     A. Felony-Murder Theory                                     36

          1. The Instant Case                                    38

     B. Malice-Murder Theory                                     40

I

Ground Six-Petitioner's Federal Constitutional Right to Due Process
was violated by Insufficient Evidence (Special
Circumstance)                                    41

Ground Seven-Petitioner's Federal Constitutional Right to Eff-
ective Counsel was Violated (Inadequate Argument)
                                                 43

Ground Eight-Petitioner's Federal Constitutional Rights to Due
Process and Effective Counsel were Violated by
Suggestive Identification Procedures             48
Due Process                                      48
Ineffective Counsel                              55

Ground Nine-Trial Counsel was Ineffective in Violation of the
Sixth Amendment (Inadequate Cross-Examination)   58

Relevant Exhibits

Relevant Transcripts

## STATEMENT OF THE CASE

Petitioner and codefendants Antonio Harris and Pauline Coleman were charged with one count of first-degree murder. It was alleged the murder was committed in the course of a robbery and that a principle was armed. The jury returned guilty verdicts on the information as charged against Petitioner and Harris. Both were sentenced to life without the possibility of parole. Coleman pled no contest to voluntary manslaughter and received 3 years after testifying against Petitioner and Harris(RT-400-03,874-75,1107).

## EVIDENCE PRESENTED AT TRIAL

About midnight on May 14, 2000, the body of Gerald Brown was found in his cream colored Lincoln in front of his residence at 5555 Bancroft in Oakland(RT-98-100). He died from multiple gunshot wounds which caused death in a very short time(RT-61-62,71-73). Brown was a drug dealer who sold his wares by delivering them to his clients(RT-155,157-58,170-72,496). Rock cocaine and cash were found in the car(RT-749,827).

Neighbors described hearing several gunshots and looking outside to see Brown's car parked at the curb(RT-256,584). When police arrived, they found his keys in the ignition and the "club" was locked in place on the steering wheel(RT-542-43). A ballistics expert testified that the slugs and shell casings found were all fired by the same weapon(RT-692).

Harris' blue Cadillac was seen in the area by several witnesses before and after the shooting. Frankie Bonner testified that she saw a blue Cadillac that did not belong on the block twice

1

that day(RT-578).  She first saw the car about 11:05 p.m.  About an hour later after she heard gunshots, she saw it driving on Bancroft (RT-581-83).  The car pulled right over next to the white car and then it took off(RT-602).  She could not describe the number of people in the car(RT-602).

Enzore Savage testified that prior to the shooting, he saw two men, whom he identified as the defendants, sitting on the side of his building at Hilton and Bancroft(RT-249-51,255).  He spoke briefly to the men and one of them asked him for a match(RT-252-53).  A while later, after he heard gunshots and he looked out his window, Savage saw Harris standing near the Lincoln.  Petitioner was stand-ing between 20 and 50 feet away and yelling, "Let's get out of here" (RT-257-58).  Savage's identification of Harris was clear and un-disputed(RT-269).  However, Savage did not identify Petitioner at a pretrial lineup, but picked out two other men(RT-292-93).  After the lineup, he realized Petitioner was also in the lineup.  Savage had known Petitioner for almost 15 years(RT-294,271).  He did iden-tify Petitioner at the preliminary hearing(RT-254).

Records from Maxferd's pawn shop in San Francisco, established that about 12 hours after Brown's death, Harris pawned four pieces of jewelry belonging to Brown(RT-620,312-13,430-31).

Coleman, Petitioner's former girlfriend, testified under a plea bargain with the prosecution.  She and Petitioner had been involved for many years(RT-130-33,138).  They used drugs, including cocaine and heroin, together daily during most of that time(RT-134-35).  Their relationship was very on-again - off-again beginning in 1999, and at the end of that year, they agreed not to see each other so often(RT-142-43).  Petitioner moved to West Oakland to

2

live with Zolekea Bissierre(RT-149).

Coleman was introduced to Brown in late 1999 by her friend Nettie and she and Petitioner began to buy rock cocaine from him(RT-153-55,355). After Coleman and Petitioner separated, she had on a few occasions exchanged sex for drugs with Brown(RT-175). She had introduced Brown to Kisa Boatley, a friend with whom she did drugs on a regular basis(RT-193,326,328).

Prior to her first jail term in 2000, Brown had fronted drugs to Coleman and she gave him a chain, from which hung the number "63" which had diamonds on it. Brown gave her $25 worth of drugs but she could only regain the chain by repaying him $50(RT-185-90). However, before she was able to repay the money, she went to jail. After she was released, she called Brown and told him she did not have the money and told her that the redemption amount had increased to $75(RT-191). Brown had been pressuring her to repay the money (RT-192-94).

Petitioner came to her house on the evening of May 14, 2000, to collect his clothing(RT-195). He was with Rodney Albritton, who was driving a burgundy Falcon and waited in the car the entire time Coleman and Petitioner were talking(RT-366-67). Petitioner told her that he wanted to rob Brown(RT-126,203-206). She claimed that he had mentioned this before and that they had agreed it would be easy to do. However, she did not think he was serious either time he mentioned it(RT-207,367-68).

However, on May 14, she agreed to help him. He told her he needed Brown to leave his house(RT-211). She suggested that she would tell Brown she had the money she owed him, and would arrange to meet him at the Vintage Inn(RT-217). She asked Petitioner how

3

he was going to accomplish the robbery. He told her he had a gun, although he did not show it to her(RT-221-22).

Coleman made three phone calls to Brown after Petitioner left. The first call was about 20 minutes after Petitioner left and she asked Brown how he was doing. That call was interrupted by a phone call from Petitioner, who told her not to set up a meeting yet because he was not there yet(RT-225-30). Petitioner told her he'd be back in East Oakland in a little while and he would call her(RT-231). He called again about two hours later and told her to set up the meeting(RT-232-33). Petitioner called again in about 10 minutes and sounded angry because she hadn't called Brown yet - he told Coleman to call Brown right away(RT-235-37). Coleman then called Brown at his house. She told him she had $50 of the $75 she owed him and asked him to meet her at the Vintage Inn(RT-237-38). Brown agreed(RT-239).

Kisa Boatley, who had been staying at Brown's house while she withdrew from methadone(RT-457-58,462), testified that Coleman called Brown at about 11:00(RT-477). She asked Brown to meet her at the Vintage Inn because she had his money(RT-479-81). However, Boatley did not tell police on the night of the shooting that Brown had received any phone calls and did not mention Coleman's name (RT-880-81).

About 30 minutes after Coleman was supposed to meet him, Brown called her from the Vintage Inn, asking where she was. Coleman told him she could not make the meeting because the person with the money had not shown up(RT-240-41). Coleman did not speak to Brown again. She did not speak to Petitioner again until two days later, when he called her. By that time, she knew Brown had been

4

killed.   The police had come to her house the morning after the hom-
icide and questioned her at the station(RT-377).   According to Cole-
man, Petitioner told her he was sorry, that the robbery was not
supposed to happen like that, and that the gun jammed and went off
(RT-307-08).   Coleman was at the police station for a number of
hours.   During the first four or five hours of the interrogation,
she did not tell them about her involvement in the crime or mention
Petitioner.   About 5:00 or 6:00 p.m., she began to tell them about
the incident(RT-377-78,742).

A dead possum, human feces, and a note stating, "Kisa, snitch
ass bitch," was left on the porch of the residence of Kisa Boatley's
family.   This occurred after Brown had been killed(RT-448-53).
Boatley testified that she was afraid to testify because of the
note(RT-456).   She admitted that no threats had been made to her
directly by Petitioner(RT-503).

Petitioner introduced several witnesses who testified to his
reputation for honesty and non-violence(RT885-886,926-27,941-42,
911-12).

5

GROUND ONE-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO CONFRONT-
ATION WERE VIOLATED.

An out of court statement made by codefendant Harris to police
officers after his arrest was introduced as evidence over defense
objection(RT-773-74). Harris did not testify at trial. The jury
was not given a limiting instruction at the time a tape of the
statement was played for the jury. The jury was instructed at the
end of trial not to consider Harris's statement against Petitioner
(RT-1056-CALJIC no. 2.08). The police interview proceeded as fol-
lows: "[SERGEANT MEDEIROS]: Okay. We're just going to ask you a
couple of questions. All we want is yes-or-no answers, okay? All
we want is just yes or no for the tape, okay? The first question
would be - and this is going back to Sunday night - (unintelligible)
- about what time was it, just so I can ask the question? [HARRIS]:
I believe about 11:30 or something. [SERGEANT MEDEIROS]: 11:30?
[HARRIS]: Yes. [SERGEANT MEDEIROS]: On this past Sunday night at
11:30 p.m., you drove to the area of 55th and Bancroft, knowing a
robbery was going to be committed, in which you had the expectation
of receiving 150 to $200 cash? [HARRIS]: Yes. [SERGEANT MEDEIROS]:
Shortly after arriving, you heard gunshots? [HARRIS]: Yes. [SER-
GEANT MEDEIROS]: Immediately after the shots, you drove away, cor-
rect? [HARRIS]: Yeah. [SERGEANT MEDEIROS]: Sergeant Cruz, any
questions? [SERGEANT CRUZ]: I don't have anything. [SERGEANT MED-
EIROS]: Is that the truth? [HARRIS]: Yes. [SERGEANT MEDEIROS]:
Okay." Harris's statement thus implied the existence of an accom-
plice who both planned the robbery and shot Brown. In two pre-
vious statements, not played for the jury, Harris expressly impli-

6

cated Petitioner as the accomplice. Because Harris did not testify and because his statement was clearly made during interrogation for the purpose of investigation and prosecution, admission of the statement violated the Confrontation Clause under "Crawford-v-Washington"(124 S.Ct. 1354-2004).

An out-of-court statement made during interrogation may not be admitted at trial unless the declarant is unavailable and the defendant has had the opportunity to cross-examine him(Crawford at 1369). "Crawford" applies to "testimonial" statements: "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement...Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard...In sum, even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class"(Crawford at 1364-65).

The statement in "Crawford" was made under circumstances similar to those herein. Crawford was on trial for assault and attempted murder, and argued he acted in self-defense. He told police that the victim had tried to rape his wife, Sylvia, and that when he and Sylvia located him in his apartment, a fight broke out. While Crawford told police that he believed the victim had a knife, Sylvia, who was also in custody as a suspect, refuted that claim

7

(id at 1357). Sylvia did not testify and her hearsay statement was introduced at trial. The United States Supreme Court found her statement was testimonial and that its admission violated the Confrontation Clause(at 1373-74).

The statement in this case clearly falls within the "Crawford" prohibition. Harris made a statement after he had been stopped and arrested on suspicion of murder. It was the product of interrogation and intended to further investigation and prosecution of the instant crime. Although the jury was instructed not to consider the statement against Petitioner, "Crawford" was nevertheless violated. The limiting instruction was not given immediately upon admission of the statement, thus allowing the jury to consider it against Petitioner for the length of the trial(see below).

Moreover, the statement was not used in a properly limited fashion by the parties, thus undoing any limiting instruction. In his opening statement, the prosecutor informed the jury that Harris admitted he went to the area knowing that a robbery would be committed and immediately heard shots and drove away(RT-39). In her opening statement, Counsel for Harris argued that the entire scheme was planned and executed by Petitioner. She argued there was only one shooter and implied that was Petitioner by arguing he had the motive. Harris's attorney also argued it was "pretty obvious from the evidence" who Harris's accomplice was, a clear reference to Petitioner(RT-46-47).

This was a clear attempt to use Harris's statement to prove Petitioner's guilt contrary to "Crawford." The error was exacerbated when Counsel argued that Harris was unaware of Petitioner's alleged plan to kill and that Harris was in his car when Petitioner

8

allegedly killed Brown(RT-48).

The parties also focused on Harris's statement in closing arg-
ument. The prosecutor played the tape of Harris' confession(RT-971)
and argued Petitioner was the driving force behind the robbery and
that it was his idea(RT-956-58). The prosecutor later argued the
jury could believe Harris was the actual shooter and that Petitioner
knew he was going to shoot(RT-988-90).

Harris' counsel countered that argument by claiming that Sav-
age only identified Harris as the likely shooter because he was
afraid of Petitioner(RT-991-92). She urged the jury to accept
Harris' version of the incident that his involvement went no fur-
ther than being the driver(RT-1003-05). Thus, Harris' statement
was clearly used as evidence of Petitioner's guilt.


The error was prejudicial.

The bulk of the evidence against Petitioner consisted of the
testimony of Coleman. She was not a reliable witness. She had cut
a deal with prosecutors contingent on her implication of Petitioner,
was involved in the crime, and had her own motive to rob and shoot
Brown: drugs, money, or to retrieve her jewelry. Moreover, Pet-
itioner had broken up with Coleman and moved in with another woman,
giving Coleman motive to falsely accuse him. These factors made
Coleman's testimony subject to rejection(see Lilly-v-Virginia 119
S.Ct. 1887,1901-1999[statement implicating defendant unreliable
when declarant suspected of involvement in crimes and statements
made to law enforcement authorities]).

9

GROUND TWO-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO CONFRONT-
ATION WERE VIOLATED.


While Harris' statement did not mention Petitioner by name, it
implicated him because it was clear from the statement that Harris
was fingering an accomplice and that he was fingering Petitioner as
the accomplice.  The statement thus violated the Confrontation
Clause under "Bruton-v-U.S."(391 U.S. 123-1968) and its progeny.

The jury was not admonished when the tape of Harris' state-
ment was played that it was not being admitted against Petitioner.
At the close of trial, the jury was instructed as follows: "Evidence
has been received of a statement made by a defendant, Mr. Harris,
after the arrest.  Do not consider the evidence of this statement
against defendant Lockhart [Petitioner]"(RT-1056-57).

However, the statement was used by both the prosecutor and
Harris' attorney to implicate Petitioner as accomplice and shooter.


"Bruton" bars the admission of a non-testifying codefendant's
out-of-court confession incriminating the other defendant.  Such
evidence violates the other defendant's right to confront the dec-
larant about his accusation(Bruton at 135-36).  In "Bruton," the
defendants were tried jointly for robbery.  Codefendant Evans had
confessed and implicated Bruton.  The jury was instructed to use
the confession against Evans only.  The United States Supreme Court
found this practice violated the Constitution because Bruton could
not cross-examine his non-testifying codefendant about the state-
ment.  The Court also held that the limiting instructions were in-
adequate to protect Bruton because the confession of a codefendant

10

is so damaging that it is unlikely a jury can follow instructions
to disregard it against the nondeclarant defendant(Bruton at 126-
30).

In "Richardson-v-Marsh"(481 U.S. 200-1987), the Court partially
addressed the problem which presents itself herein.  In "Marsh," the
codefendant's confession was edited by the trial court to exclude
all reference to the existence of Marsh.  Marsh claimed that the
editing was inadequate and that the statement should have been ex-
cluded because it was incriminating to her when considered with her
own testimony.  The codefendant's statement indicated that on the
drive to the victim's house, he had discussed with another named
individual the necessity of killing the victims.  It was Marsh's
testimony, not the codefendant's statement, that indicated Marsh
was present in the car during the discussion.

The Supreme Court held that the editing was adequate and that
the Confrontation Clause is not violated by a codefendant's confess-
ion that has been redacted "to eliminate not only the defendant's
name, but any reference to his or her existence," even though the
confession may incriminate the defendant when considered in con-
junction with other evidence, as long as the jury is instructed
not to consider the confession against the nondeclarant defendant
(id at 211, fn. omitted, emphasis added).

In "Gray-v-Maryland"(523 U.S. 185-1998), the Supreme Court
addressed another manner of editing a nontestifying codefendant's
confession.  In that case, the codefendant's statement had been
redacted to eliminate the defendant's name, but every place the
defendant was mentioned the statement contained a blank or the word
"deleted"(id at 189).  When instructing the jury, the trial judge

11

specified that the confession was evidence only against the declarant and could not be used against Gray(id). The Court held such editing was insufficient. The Court stated that the statements therein, even with the editing, "so closely resemble 'Bruton's' unredacted statements that, in our view, the law must require the same result. For one thing, a jury will often react similarly to an unredacted confession and a confession redacted in this way, for the jury will often realize that the confession refers specifically to the defend-ant. This is true even when the State does not blatantly link the defendant to the deleted name, as it did in this case..."(Gray at 192-93).

"Gray" distinguished the obviously inculpatory statement before it from the kind of statement found acceptable in "Marsh": "[T]he factual statement at issue in [Marsh] - a statement about what others said in the front seat of a car - differs from directly accusatory evidence in this respect, for it does not point directly to a def-endant at all"(Gray at 195[emphasis added]).

In the instant case, as in "Gray," it was obvious that the statement at issue referred to a perpetrator other than the speaker and that perpetrator was alleged to be the defendant. It is clear that Harris was referring to the acts of a coperpetrator when he said he knew there would be a robbery and that he was in the car when the shots were fired - obviously by that coperpetrator. The statement thus violated "Bruton." As the "Gray" Court explained: "Richardson must depend in significant part upon the kind of, not the simple fact of, inference. Richardson's inferences involved statements that did not refer directly to the defendant himself and which became incriminating "only when linked with evidence

12

introduced later at trial." [] The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial"(Gray at 196).

Even though there were not obvious blank spaces in the confession in this case, Harris' statement "obviously refer[red] directly to someone" and that someone was "obviously the defendant" (Gray at 196). The jury could have made these inferences on the basis of the statement alone and before any other evidence was introduced(id). Moreover, the prosecutor and Harris' attorney worsened matters by explicitly relying on the statement in arguing Petitioner was guilty. Indeed, the jury could only have concluded that Harris' counsel's interpretation of the statement had been confirmed to the attorney by Harris himself.

In sum, Harris' statement implied the existence of an accomplice and that the accomplice planned the robbery and shot the victim. This fact alone was sufficient to violate the Constitution notwithstanding the limiting instruction(Gray, supra; U.S.-v-Richards 241 F.3rd 335,341-3rd Cir.2001[Confrontation Clause violated by codefendant's redacted confession which referred, not directly to defendant, but to his existence]; Standford-v-Parker 266 F.3rd 442,457-6th Cir.2001[same]; U.S.-v-Parks 285 F.3rd 1133,1139-9th Cir.2002[same]; see U.S.-v-Gonzalez 183 F.3rd 1315,1322-11th Cir. 1999[Confrontation Clause violated when codefendant's redacted confession contained physical description which obviously referred to Gonzalez]).

13

Moreover, the arguments of Harris' counsel and the prosecutor fatally undermined the limiting instruction(RT-47-48,1000,1003-04; RT-39,1033; RT-1035[prosecutor arguing jury could conclude Harris was merely the driver]). "Marsh" recognized the possibility counsel arguments can unconstitutionally undermine a "Bruton" limiting instruction(at 211[remanding for consideration of whether prosecutor's attempt "to undue the effect of the limiting instruction by urging the jury to use [the codefendant's] confession" justified relief]; U.S.-v-Sherlock 865 F.2nd 1069,1080-9th Cir.1989[Constitutional error when prosecutor "flouted the limiting instruction" and used statement against defendant]).

Notwithstanding whether the statement was facially incriminating, the Constitution was still violated. That is because this case lacked "a proper limiting instruction"(Marsh at 211). The instruction in this case was insufficient because not given contemporaneously with admission of Harris' statement(compare Marsh at 203-04[wherein limiting instruction given "at the time" codefendant's confession was admitted]).

When a statement is not incriminating on its face but "only when linked with evidence introduced at trial"(id at 208), i.e., the statement is redacted, it will still violate the Constitution unless accompanied by a proper limiting instruction(id): "Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence...[With a facially incriminating statement], "the only issue is, plain and simply, whether a jury can possibly be expected to forget it in assessing the defendant's

14

guilt; whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget"(at 208).

In this case, the jury was not given an instruction applying to Harris' statement until days after it was admitted(RT-773-74, 1056) and after conclusion of the evidentiary phase.  Absent timely instruction, the jury no doubt entered onto the forbidden "path of inference" immediately upon admission of Harris' statement, particularly given Harris' counsel's opening argument.  "Marsh" holds that timely instruction would have blocked that path.  The jury cannot be expected to have disregarded the inference, once made, due to instructions given after the fact(Bruton at 130).  "A redaction, no matter how perfect, nevertheless requires an appropriate limiting instruction...the 'Richardson' limiting instruction must be given immediately following the introduction of the co-defendant's confession to safeguard against inappropriate use of the confession against the non-confessing co-defendant"(Fowler-v-Ward 200 F.3rd 1302,1307-10th Cir.2000[finding 'Bruton' violation when statement properly redacted but no instruction given when statement admitted]; Spears-v-Mullin 343 F.3rd 1215,1232-10th Cir.2003 [same]; U.S.-v-Walker 148 F.3rd 518,524-25-5th Cir.1998; see U.S. -v-Doherty 233 F.3rd 1275,1283-11th Cir.2000['Bruton' error not cured by instruction at end of trial to disregard facially incriminating statement]).

As such, the Constitution was violated.

Admission of Harris' statement was prejudicial.  Savage and

15

Coleman were the only witnesses connecting Petitioner to the offense. Because Coleman was an accomplice as a matter of law(RT-1068-69), rejection of Savage's testimony would have required acquittal(Penal Code §1111[defendant cannot be convicted solely on testimony of accomplice absent independent corroboration]).

A. Robbery and Murder.

Savage's identification of Petitioner was very problematic. He failed to do so at the line-up(RT-292-93). Savage only identified Petitioner at the preliminary hearing(RT-254) after recognizing Petitioner as someone known to Savage for 15 years(RT-271). This provided a basis for the jury to conclude the identification was based, not on observation of the crime, but on Savage's pre-existing acquaintance with Petitioner and Petitioner's presence in the line-up and in court(see People-v-McDonald 37 C.3rd 351,374 fn.20-1984 [discussing phenomenon of "unconscious transfer" where an identifying witness "confuses a person seen in one [non-crime] situation with a different person seen in [a criminal context]"]; U.S.-v-Montgomery 150 F.3rd 983,992-9th Cir.1998[identification procedure suggestive when witness shown photos of Montgomery and allowed to view him in courtroom before identifying him for jury]).

Coleman implicated Petitioner in robbery and claimed Petitioner incriminated himself(RT-126,203-06,211-22,225-37,307-08). Her credibility was highly suspect given her own complicity(RT-217-22, 225-30,237-38) and independent motive both to rob Brown (i.e. drugs, money, and to retrieve her jewelry-RT-175,185-94) and to falsely accuse Petitioner (i.e. their domestic troubles, her need to curry favor with police-RT-142-49,375,401-04). That a defendant's all-

16

eged out of court admissions are to be viewed with skepticism(RT-
1062-63; CALJIC no. 2.70, 2.71.7) provided the jury an additional
reason to disbelieve Coleman.

As such, the jury could reasonably have rejected Coleman's
and/or Savage's testimony. Harris' statement, which suggested
Petitioner's involvement in robbery and corroborated Coleman and
Savage, was very prejudicial.

Harris' statement was also prejudicial as to <u>murder</u> liability.
By suggesting Petitioner shot Brown, the statement rendered Pet-
itioner automatically liable for felony murder(People-v-Dominguez
22 C.R.3rd 249,255-2004). The other evidence' indicated Harris was
the shooter(see RT-256-57) and thus allowed for the conclusion
Petitioner was innocent of murder even if guilty of robbery(see
below at 36-40 ; People-v-Cavitt 33 C.4th 187,196-2004).


B. Felony-Murder Special Circumstance.

Harris' statement was particularly prejudicial as to the
special circumstance, which required proof Petitioner himself killed,
or (if he did not) intended Brown be killed, or was recklessly
indifferent to life(CALJIC no. 8.80.1).

Savage indicated <u>Harris</u> shot the victim. His and Coleman's
testimony was otherwise silent on intent to kill and reckless in-
difference(see below at 30-35 ). In contrast, Harris' statement
indicated Petitioner shot Brown, thus <u>obviating</u> the need to prove
intent or indifference(CALJIC no. 8.80.1). Given the lack of
other evidence on the issue, the jury <u>necessarily</u> relied on
Harris' statement to find the special circumstance true.

17

GROUND THREE-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE
PROCESS AND EFFECTIVE COUNSEL WERE VIOLATED.

The prosecution introduced evidence that threats had been made
to two of its witnesses. Deputy Wong testified that on July 17,
2000, a dead possum and human feces, along with a note reading,
"Kisa, snitch ass bich (sic)," had been left on the porch of Kisa
Boatley's family's home(RT-448-52). Boatley testified immediately
after this evidence was introduced that she was afraid to be test-
ifying, because there was a note on her door that said, "Die Bitch,"
as well as a dead rat(RT-456). She was aware of no threats made to
her in behalf of Petitioner(RT-503).

DA Investigator Ocala testified over defense objection that he
had a hard time serving Enzore Savage and had to obtain a warrant
to secure his attendance at trial. When Ocala went to his place of
work, Savage stated he wouldn't come to court and that he was con-
cerned about Michael Lockhart and that threats had been made to him
and his family. He stated that he was concerned that if he testi-
fied he and his family would be killed(RT-531). Savage had testified
previously and identified both defendants as present at the scene
of the shooting(RT-251,255). After spending a night in jail(RT-
298), he testified at trial without doubt that Harris, not Petition-
er, was the man standing at the car after the gunshots(RT-275-77).
He denied that he was falsely testifying because he was afraid for
his safety(RT-299). However, Savage made clear that he was in
court against his will(RT-281). The prosecutor asked him if he was
afraid of Petitioner or his family. An evasive Savage answered
"yes" and "no"(RT-280-81,282).

18

Harris' defense counsel took the threat evidence even further and argued that the reason Savage identified Harris, rather than Petitioner, as the shooter and failed to identify Petitioner in a lineup was because he was afraid of Petitioner's brother(RT-991-92, 995,1001). She also commented on Savage's demeanor at trial, "I want to point out that Mr. Savage was so frightened to come to court, he couldn't even face and look at Mr. Harris and Mr. Lockhart. He turned his head to the wall the whole time(RT-1001). The prosecutor likewise argued, in rebuttal, that Savage had told Ocala he was afraid of Michael Lockhart(RT-1036).

In further attempting to establish Lockhart as the more guilty party, defense counsel for Harris tried to establish that he not only had a reason to go after the victim because of his relationship with Kisa Boatley, but also that Petitioner was responsible for the note and witness intimidation against her; "...There's also the inference that [Petitioner] - and you can look at Pauline Coleman's testimony to...and I submit to you, [Petitioner] had the information to know where Kisa Boatley was living to make sure that she had a dead possum and some feces on her step. And I submit to you, there is an inference delivered by the guy we heard about, Michael Lockhart, to scare her from testifying"(RT-994,1000).

Petitioner's counsel argued that the Boatley incident added nothing to the evidence of guilt because there was no evidence who did it(RT-1013).

In spite of this extreme focus on the threats that were made

19

to these witnesses, no instruction was given to the jury about how the information could be used. The jury was neither told of its relevance or told of any limitations on its use. The Trial Court should have provided instruction sua sponte to inform the jury about the proper use of this extremely prejudicial information and to limit it to the proper scope of its relevance. In the alternative, defense counsel was ineffective when he failed to request such instruction.

As demonstrated, the district attorney and counsel for Harris used the threat evidence to convince the jury Petitioner had something to hide or to fear from Savage's and Boatley's testimony, thus supporting an inference of his guilt.

Evidence of such threats can be relevant in two ways. Such evidence may be admissible to show a defendant's consciousness of guilt(CALJIC no. 2.06) or may be relevant on the issue of witness credibility. The Trial Court failed to insure the threat evidence would be properly used by the jury because it failed to provide any guidance as to the reasons for its admittance and did not limit the jury's consideration of the evidence.

"Generally, evidence of the attempt of third persons to suppress testimony is inadmissible against a defendant where the effort did not occur in his presence.[citation] However, if the defendant has authorized the attempt of the third person to suppress testimony, evidence of such conduct is admissible against the defendant"(People-v-Hannon 19 C.3rd 588,599-1977). "[I]n order for a jury to be instructed that it can infer a consciousness of guilt from suppression of adverse evidence by a defendant, there must be some evidence in the record which, if believed by the jury, will sufficiently

20

support the suggested inference. Furthermore, the determination
of whether there is such evidence in the record is a matter which
must be resolved by the trial court before such an instruction can
be given to a jury"(Hannon at 597-98).   Further, where the suppres-
sion effort is not personally made by the defendant, there is another
threshold which must be crossed.   There must be evidence sufficient
to establish that it was the defendant who authorized any efforts
to frighten or intimidate a witness(ibid; compare People-v-Williams
16 C.4th 153,198,201-1997[intimidation evidence admissible when
sufficient evidence to infer defendant authorized intimidation]).

The evidence in this case was admitted without any foundation
connecting it to Petitioner.   The fact that Petitioner's brother
had named Savage as someone he was concerned about is not sufficient
to establish that Petitioner in any way requested or authorized him
to intimidate anyone on his behalf.   Certainly the use of Michael
Lockhart by Harris' attorney to insinuate in her closing argument
that he was also responsible for the Kisa Boatley incident lacked
any foundation whatsoever.   Yet she argued the jury should draw a
consciousness of guilt inference.   This was error(People-v-Terry
57 C.2nd 538,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["Relationship to the defendant [of the
intimidator] does not prove authorization [citations] and the
interest of the third person in the defendant clearly stands on
no higher ground"]).


As demonstrated, the evidence of witness intimidation and
threats was inadmissible as consciousness of guilt evidence.
Accordingly, the Trial Court stated it was admitting the evidence
only as to Savage's credibility(RT-573-74).   Although the Court

21

indicated it would give a limiting instruction to this effect, it
did not do so and, as demonstrated above, the prosecutor and Harris'
counsel clearly used it for more than credibility evidence. While
evidence of a fear of testifying may be relevant to credibility,
the jury should be instructed on the purpose of its admission and
told when it should not be considered as proof of guilt. This is
so because of the highly prejudicial nature of the evidence(People
-v-Warren 45 C.3rd 471,481-1987).

Admission of the evidence, the failure to instruct, and the
improper use of the evidence violated Due Process in this case.
In "Dudley-v-Duckworth"(854 F.2nd 967-7th Cir.1988), a codefendant
who had entered a plea bargain with the prosecution testified
against the defendants. In response to the prosecutor's questions,
the witness explained that he felt nervous about testifying because
he had received some phone calls and was concerned for the safety
of his aunt and girlfriend. He was afraid that whoever made the
phone calls might hurt his mother(id at 969).

The Seventh Circuit found that admission of the threat evidence
violated the Fourteenth Amendment because the threats came from an
unknown source and were not linked to Dudley or his codefendants
except by prejudicialinnuendo. The state argued that it was rele-
vant to explain the witness' demeanor on the stand. The Court
responded that the record did not establish that the witness' de-
meanor was unusual or problematic. The Court thus suspected the
prosecutor of using subterfuge to ensure the admission of the highly
prejudicial evidence(id at 970-71). Petitioner submits that this
is also a problem in regards to Boatley's testimony in this case.
Just as the prosecutor did in "Dudley," as soon as Boatley took

22

the stand, the prosecutor questioned her about how she felt about
testifying, and she referred to the note and a dead animal, which
had been described immediately before she testified by Officer
Wong(RT-448-56). The record contains no information that Boatley
had resisted testifying, that her demeanor was unusual, or that
she had changed her testimony in any way.

Perhaps to give even greater weight to the information about
Boatley's threats, immediately after she testified, the prosecutor
called Officer Ocala to testify about Savage's behavior and concern
about Michael Lockhart(RT-529-32).

There is another similarity between this case and "Dudley."
The Court noted that when the witness testified, he initially
stated he was nervous because the prosecutor had said something to
him that morning(at 971). Similarly, in this case, there was a
possibility Savage's demeanor and his being upset was the result,
not of threats, but of his being arrested and put in jail in order
to secure his attendance at trial

The "Dudley" Court called evidence of threats "an evidential
harpoon" and held that admission of the evidence was of constitu-
tional dimension because it undermined the defendant's credibility
and the only two witnesses who implicated the defendant in the
crime were immunized accomplices(Dudley at 972; compare People-v-
Olguin 31 C.A.4th 1355,1368-1994[admission of threat evidence not
error when limited to proof of witness credibility, jury was pro-
perly instructed to that effect, and evidence not argued as con-
sciousness of guilt]).

In sum, the failure to instruct in this case and the improp-
er consciousness of guilt arguments were extremely prejudicial

23

and violated Due Process(Garceau-v-Woodford 275 F.3rd 769,780-9th
Cir.2001[Due Process violated when jury invited to draw improper
inferences from otherwise admissible evidence]; Dudley at 970
["'[Threat] evidence becomes so prejudicial to a defendant that no
jury could be expected to apply it solely to the question of the
credibility of the witness before it and not to the substantial
prejudice of the defendant'[citation]"]).

        Trial Counsel was ineffective for failure to request instruc-
tion limiting use of the threat evidence(U.S.-v-Span 75 F.3rd 1383,
1390-9th Cir.1996[attorneys ineffective for failure to request pro-
per instruction]; White-v-McAninch 235 F.3rd 988,997-98-6th Cir.
2000[counsel deemed ineffective for failure to request limiting
instruction with respect to evidence]; Freeman-v-Class 95 F.3rd
639,641-8th Cir.1996[counsel deemed ineffective for failure to
request cautionary instruction]).

        An attorney is ineffective if his performance falls below
an objective standard of reasonableness and, absent counsel's error,
it is reasonably probable the jury would have acquitted(Strickland
-v-Washington 466 U.S. 668,687-88,694-1984).

        Forecite, a book on California jury instructions, suggests
that in the case of third-party threats, defense counsel should
request the following instruction: "If you find that an effort to
suppress evidence was made by another person for the defendant's
benefit, you may not consider that effort as tending to show the
defendant's consciousness of guilt unless you also find that the
defendant authorized such effort"(Forecite 2.03d).

        For the above stated reasons, Counsel's failure to request

24

such instruction was deficient(White-v-McAnninch at 997-98).

In "Dudley," the Seventh Circuit found the admission of threat evidence was so overwhelmingly prejudicial, that it granted a petition for writ of habeas corpus. The Court found the evidence of guilt was "impressive, but not overwhelming," noting that in a lengthy trial the only two witnesses to connect Dudley to the offense were accomplices testifying in exchange for immunity or dismissal of charges(ibid).

A similar result should occur in this case. There was no eyewitness to the shooting. The only witness who claimed to see the people involved, Savage, identified Harris as the shooter. Evidence Petitioner was allegedly trying to induce him not to testify undermined his defense theory he was not involved in the crime and was used by Harris' attorney to argue that Savage identified Harris only because he was afraid of Lockhart. The physical evidence connected only Harris to the shooting. It was Harris' blue Cadillac that was seen outside near the crime scene and it was Harris, 12 hours after the murder, who pawned the victim's jewelry. Most significantly, Harris confessed his participation in the crime, although he minimized his involvement.

The prosecution's case against Petitioner rested entirely on the testimony of Pauline Coleman, who was sharply impeached and herself implicated in the crime(above at 9 ; Dudley at 972).

In rebuttal, the prosecutor made much of the fact Harris pawned the jewelry at a pawn shop at which Petitioner had done business before(RT-1032). However, it was undisputed that Harris was the person at the pawn shop. There was no evidence as to why

25

he went to that particular shop or that Petitioner accompanied him. Indeed, the evidence showed Petitioner had only used the shop once in 1995 and once in 1998(RT-627). The last visit was thus almost two years before the instant crime. Moreover, it was Coleman who conducted the 1998 transaction and it was only the word of Coleman Petitioner was involved in that transaction(RT-631-33,144-45).

Finally, Brown's activities as a drug dealer and loan shark, as well as his numerous relationships with women provided ample motive for others to rob and/or kill him. Keith Wilson, against whom Brown had obtained a restraining order because he pulled a gun on him, was a likely suspect who had not even been investigated (RT-1025-26;819-20).

After a close examination of the evidence, it cannot be concluded the errors were harmless beyond a reasonable doubt. For the same reasons, Counsel's omission was prejudicial under "Strickland."


FOOTNOTE ONE-The State Appeals Court relied on an alleged Trial Court "instruction" "limiting" consideration of Ojala's testimony to Savage's credibility(Ct. Opinion at 32). However, the Trial Court's statement did not address threat and fear testimony from Boatley and Savage himself(RT-280-82,298-99). Further, the Ojala "instruction" did not unequivocally limit consideration of Ojala's testimony. The Trial Judge stated: "This [Ojala's testimony] was a subject of our in-chambers session, and I think it has some limited relevancy, which would -- it's limited to the testimony of -- I believe it's going to be limited to the testimony of Mr. Savage and how this might bear on his believability...and credibility"

(RT-530).  The Judge merely said he "believed" the testimony was "going to" be so limited.  Such is hardly an unequivocal directive to the jury.  Indeed, the Court was merely speaking to the attorneys, not the jury(id).

Further, the Judge himself did not consider the above language an instruction.  The Judge later stated about Ocala's testimony: "I think the Court will give a limiting instruction.  I plan to. And if you have some special instruction because there is, at this point, no evidence at all that your client, Mr. Eric lockhart, is in any way involved, or has made any threats, you know, through his brother, certainly nothing directly, if he wants a special instruction to that respect, I'll certainly consider it, Mr. Sherrer"(RT-573-74).  Obviously, the Judge would not have to "think about," "plan," or "consider" giving a limiting instruction he has already given.

27

—

GROUND FOUR-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS
WAS VIOLATED BY INSUFFICIENT EVIDENCE.

Due Process is violated by conviction based on evidence from
which no reasonable jurist "could have found the essential elements
of the crime beyond a reasonable doubt"(Jackson-v-Virginia 443 U.S.
307,319-1979).

There was insufficient evidence to support the felony-murder
special circumstance in this case.  To impose it, the prosecution
had to prove either (1) that Petitioner himself killed Brown dur-
ing a robbery, (2) that Petitioner aided Harris' shooting of Brown
with intent to kill, or (3) that Petitioner aided the robbery as
a "major participant" and with "reckless indifference to human life"
(CALJIC no. 8.80.1; Pen.Code §190.2(a)(17); People-v-Williams 16
C.4th 635,689 fn.21-1997).

a.   Actual Killer.

There was no evidence Petitioner shot the victim.   Indeed, the
prosecutor argued Harris was the shooter(RT-1040,1035-36).   The
Trial Judge stated the evidence was "murky" as to who shot Brown
(RT-1110).   Savage, who identified Harris and, arguably, Petitioner
at the scene(RT-250-58), did not actually see the robbery or killing.
Savage indicated Harris was the shooter by testifying Harris was
standing next to Brown's car just after shots were fired(RT-256).
According to Savage, Petitioner was some 20 yards away from the car
and Brown(RT-257).   Testimony established a gun fired from twenty
yards away could not have ejected shell casings into the car where
they were found(RT-711-12,562-63).   Ballistics evidence established

28

there was a single shooter(RT-690-95,702). This evidence was
insufficient.

Similarly, "People-v-Smith"(135 C.A.4th 914-2005) found in-
sufficient evidence Smith had actually killed the victim (or had
intent to kill) when an accomplice was equally likely to have done
so (at 927[noting that "[A] 'coin flip' situation like this does
not constitute substantial evidence"]). "People-v-Allen"(165 C.A.
3rd 616-1985) concluded there was insufficient evidence Allen,
rather than the accomplice, had shot the victim when, as in this
case, the precise circumstances of the shooting were unclear: "Since
the evidence of what happened in the kitchen proved at most a 50
percent probability that [Allen] was the [shooter], the state's
burden was not met"(at 626; see U.S.-v-Hall 999 F.3rd 1298,1299-8th
Cir.1993[evidence insufficient Hall inflicted fatal injuries when
wife present and equally likely to have done so]; Fagan-v-Washington
942 F.2nd 1155,1159-60-7th Cir.1991[same when victim killed with
different gun than defendant's and other armed individuals pre-
sent]).

Indeed, the evidence was insufficient Petitioner was even
armed during the crime. Savage did not testify Petitioner was
armed. Coleman claimed Petitioner merely said he would use a gun
(RT-222). She claimed to have last seen Petitioner with a revol-
ver some years before the shooting(RT-373-74,852). The murder
weapon was an automatic(RT-677).

It was, at best, "50-50" as to who shot Brown. The evidence
was thus insufficient to prove Petitioner the shooter(Allen, supra;
Hall, supra; CALJIC no. 2.01["[I]f the circumstantial evidence [as
to any particular count] permits two reasonable interpretations,

one of which points to the defendant's guilt and the other to his
innocence, [the jury] must adopt that interpretation that points
to the defendant's innocence"]).

b.    Intent to Kill.

Assuming Harris shot Brown with intent to kill, no evidence
indicated <u>Petitioner</u> intended Brown be killed(CALJIC no. 8.80.1).
Coleman testified Petitioner indicated Brown would not retaliate
against the robbers(RT-208).  Coleman testified that, after the
killing, Petitioner stated the robbery was not supposed to happen
that way(RT-301).  These statements, if true, suggest Petitioner
intended Brown survive the encounter.

Evidence regarding the crime itself did not indicate an intent
to kill.  Evidence indicated Petitioner was 20 yards away when
Brown was shot(RT-257).  There is no evidence Petitioner was armed,
knew Harris was armed or intended to kill, or directed or encour-
aged Harris to do so(People-v-Prettyman 14 C.4th 248,259-1996
[accomplice liability requires defendant know and share perpetra-
tor's criminal intent and encourage or facilitate commission of
the offense]).

Analogous is "People-v-Williams"(16 C.4th 635-1997).  Williams
was convicted as an accomplice of murder and a special circumstance
requiring proof he intended to kill(at 688-89).  Williams' pros-
ecutor "never presented...any...evidence regarding defendant's role
in the murders,..."(id).  The evidence of intent to kill was thus
insufficient(at 690 fn.22).

In this case, no evidence was presented regarding Petitioner's
role in the shooting (as opposed to the robbery).  "[T]he manner

in which the actual perpetrator committed the murder...did not it-
self reveal an intent to kill by defendant as an aider and abettor"
(Williams at 690).  The evidence was thus necessarily insufficient.

Analogous also is "Mitchell-v-Prunty"(107 F.3rd 1337-9th Cir.
1997).  In that case, a California prosecution, the victim was
driven over and crushed by a car.  Although Mitchell was a passenger
at the time, the Ninth Circuit concluded there was insufficient
proof Mitchell "instigated, encouraged, or assisted the driver in
crushing [the victim] with the car"(at 1342): "There is no proof
that the vehicle that killed [the victim] was owned or provided by
Mitchell for the purpose of doing the running over [or] that Mit-
chell said anything to the driver of the vehicle in the minutes
[before the killing]; In short, there is nothing at all to suggest
that Mitchell helped bring about [the] death...There is, in other
words, a massive failure of proof that Mitchell aided and abetted
[the] killing"(at 1342).

In this case, there is no evidence Petitioner provided the
gun or by word or deed encouraged the shooter or otherwise brought
about Brown's death.  Of course, his mere presence during the
shooting does not establish intent(Mitchell at 1342; CALJIC no.3.01).
There is thus a "massive failure of proof" of intent to kill(com-
pare Moore-v-Deputy Comm. 946 F.2nd 236,245-3rd Cir.1991[sufficient
evidence non-shooter was accomplice to killing when he loaded
rifle at scene of crime and urged it be used]).

c.    Reckless Indifference.

There is insufficient evidence of "reckless indifference."
Proof of reckless indifference requires an evidentiary showing

31

the defendant "knowingly engaged in criminal activities known to
carry a grave risk of death"(People-v-Estrada 11 C.4th 568,592-1995).
This is a subjective standard requiring proof defendant was actually
aware of the risk of death(at 591; see at 592["[O]ne cannot be
indifferent to something of which he or she is unaware"]).   The
standard is not met by proof the defendant was merely negligent,
"neglectful, heedless or rash"(id).

Several cases have set forth the circumstances demonstrating
reckless indifference.  "People-v-Mora"(39 C.A.4th 607-1995) found
sufficient evidence of reckless indifference when Mora arranged
for his armed accomplice to enter the victim's home, did not attempt
to aid the victim after he was shot, and instead continued on with
the robbery(at 617).  "People-v-Proby"(60 C.A.4th 922-1998) found
reckless indifference when Proby provided his accomplice with a
gun, saw the accomplice shoot the victim but made no attempt to aid
the victim and continued on with the robbery.  Proby also knew of
the accomplice's willingness to do violence and that the accomplice
might be recognized and have to kill to avoid apprehension(at 929-
30).  "People-v-Bustos"(23 C.A.4th 1747-1994) found reckless indif-
ference when Bustos hit and struggled with the resisting victim,
knew his accomplice was armed and might come to Bustos' aid, and
did not express suprise when the accomplice stabbed the victim(at
1754).  "People-v-Smith"(135 C.A.4th 914-2005) found reckless in-
difference when Smith, who remained outside, could hear his accom-
plice noisily beating and stabbing robbery victim, the accomplice
emerged covered in blood, and Smith fled rather than aiding
the victim(at 927-28).

This case exhibits none of the earmarks of reckless indif-

ference present in the above-cited cases.  There is no evidence
Petitioner knew that, when Harris fired, Brown had been shot(Mora;
Proby).  There is no evidence Petitioner knew he could help Brown,
who died almost instantly(RT-72-73).  Conversely, there is no evi-
dence Petitioner left without attempting to aid or checking on Brown
(Mora; Smith).  There was no evidence Petitioner provided Harris
a gun or knew Harris was armed(Proby; Bustos).  There is no evi-
dence Petitioner continued with the robbery after  Brown was shot
(Mora; Proby).  Indeed, there is no evidence Petitioner himself
contacted Brown or took property from him.  He was allegedly stand-
ing some distance away when shots rang out(RT-257).  At worst,
this suggests Petitioner had already completed any takings before
Brown was unnecessarily shot.  There is no evidence Brown knew Har-
ris.  There is thus no evidence Petitioner knew Harris might shoot
Brown to avoid being identified(Proby).  There is no evidence that
Petitioner or Harris assaulted Brown before the shooting or that
Brown resisted the robbery(Bustos; Smith).  There is no evidence
Petitioner had an opportunity to prevent the shooting(Smith) or
was unsuprised when it occurred(Bustos; compare Tison-v-Arizona
481 U.S. 137,151-1987[reckless indifference when defendant had
opportunity, but failed, to assist victims during or after shoot-
ings]).

    In sum, the evidence is perfectly consistent with the absence
of any of the above factors and is thus consistent with the absence
of reckless indifference.  Evidence equally consistent with inn-
ocence does not support an inference of guilt(CALJIC no. 2.01;
Stallings-v-Tansy 28 F.3rd 1018,1022-10th Cir.1994).

    Analogy to cases involving the natural and probable con-

sequences doctrine (NPC) is also instructive. "'Liability for the natural and probable consequences of an intended act is regarded as legally equivalent to liability for reasonably foreseeable con-sequences, and is another way of expressing liability for negli-gence'[citation]"(People-v-Smith 57 C.A.4th 1470,1479-1997). In addition, "recklessness transcends negligence [and] requires that the defendant subjectively appreciate the dangerousness of the circumstances"(at 1480; People-v-Estrada at 591-92). Because the evidence herein was insufficient under the NPC standard, it was also insufficient under the CALJIC no. 8.80.1 recklessness standard.

Under NPC doctrine, a defendant may be held criminally liable for an unintended crime that is a "foreseeable" consequence of the "target" crime the defendant did intend to aid and abet(People-v-Prettymen 14 C.4th 248,261-1996). Foreseeability "is a factual question to be resolved by the jury in light of all the circum-stances surrounding the incident"(People-v-Nguyen 2 C.A.4th 492, 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).

Under this standard, the robbery in this case was the intended "target" crime. The shooting was unintended and thus must be proven foreseeable. Murder is not always a foreseeable consequence of robbery: "Robbery is a crime that can be committed in widely varying circumstances"(Nguyen at 532). There is no evidence the killing herein was foreseeable and thus that Petitioner was reck-lessly indifferent. There is no evidence Petitioner was armed, knew Harris was armed or had an intent to kill or tendency for violence. Indeed, enlistment of an accomplice suggests an intent simply to physically overpower Brown. As stated in "Prettyman": "If, for example, the jury had concluded that defendant Bray had

34

encouraged codefendant Prettyman to commit an assault on [the vic-
tim] but that Bray had no reason to believe that Prettyman would use
a deadly weapon such as a steel pipe to commit the assault, then
the jury could not properly find that the murder of [the victim]
was a natural and probable consequence of the assault encouraged
by Bray"(at 267; People-v-Butts 236 C.A.2nd 817,837-1965[killing
not foreseeable when defendant unaware accomplice armed]; People
-v-Godinez 2 C.A.4th 492,504-1992[jury could reasonably conclude
fatal stabbing not foreseeable when Godinez testified he was un-
aware accomplice armed]).

In this case, evidence indicated only a planned robbery(RT-
207-11). Evidence did not reveal the precise manner it was to
be committed or the manner it was in fact committed. Evidence of
the circumstances of the commission of the intended felony is
necessary to prove an unintended crime was foreseeable(Nguyen at
531). The silence of the record on this point must cut against
the prosecution which, of course, has the burden of proof(CALJIC
no. 2.01). As such, the evidence of foreseeability and thus
reckless indifference was insufficient(compare People-v-Durham 70
C.2nd 171,185-1960[shooting reasonably foreseeable when defendant
knew accomplice armed and accomplice had exhibited and fired guns
during prior robberies]).

FOOTNOTE ONE-Analogous is "Juan H-v-Allen"(408 F.3rd 1262-9th Cir.
2005), in which evidence showed Juan H. and his brother had con-
fronted two gang rivals during which the brother shot at the men,
killing one. The Ninth Circuit found Juan H's mere presence during
the shooting was insufficient to establish his accomplice liability

35

for murder and attempt murder (felony-murder was not at issue):
"...That juan H. stood behind his older brother after the family
home had been attacked (the alleged motive for the shooting), even
if he knew his brother was armed, does not permit the rational in-
ference that he knew his brother would, without provocation, assault
or murder the victims"(at 1278).  Moreover, "the record does not
reflect any evidence that Juan H. intended, through his actions,
to assist [his brother] in committing first degree murder.  Juan H.
did not do or say anything before, during, or after the shooting
from which a reasonable factfinder could infer an intent or purpose
to aid and abet [the shootings]"(at 1278-79).

    In this case, the mere evidence Petitioner confronted Brown
with Harris and was present during the shooting does not provide
an inference he knew Harris would kill Brown or intended to do so.
This is true even if one assumes Petitioner knew Harris was armed
(an assumption for which there was no evidence).  As in "Juan H.,"
there is no evidence Petitioner did or said anything, "before,
during, or after the shooting..." from which an intent to kill may
be inferred(see Piaskowski-v-Bett 256 F.3rd 687,691-92-7th Cir.
2001[Evidence defendant present with conspirators during beating
of victim insufficient to prove he participated in beating, killing,
or conspiracy to kill]).

GROUND FIVE-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS
WAS VIOLATED.

A. Felony Murder Theory.

The jury was given the option of convicting Petitioner on a
"felony-murder-robbery" theory(RT-1071-73).  A robber who himself
kills during a robbery is guilty of first degree murder(People-v-
Pulido 15 C.4th 713,720-1997; People-v-Dominguez 22 C.R.3rd 249,
255-2004).  As demonstrated(above at 28-30 ), there was insufficient
evidence Petitioner himself killed Brown.  To impose felony-murder
liability on a non-shooter accomplice, the killing must be temp-
orally and causally related to the felony the accomplice aided.
There is insufficient evidence of a causal connection in this case.

The felony-murder rule imposes murder liability for a killing
committed during a felony on any person jointly engaged with the
killer in the commission of the felony(RT-1072-73; CALJIC no.8.27).
However, there must be a "logical nexus between the felony and the
homicide"(People-v-Cavitt 33 C.4th 187,199-2004).  Accordingly, the
felony-murder rule "does not apply to non-killers where the act
resulting in death is completely unrelated to the underlying felony
other than occurring at the same time and place"(id at 196).  While
proof that the killing was intended to facilitate the felony is
unnecessary, "a confederate who performs a homicidal act that is
completely unrelated to the felony for which the parties have com-
bined cannot be said to have been 'jointly engaged' in the perpet-
ration or attempt to perpetrate the felony at the time of the kil-
ling"(id at 197-98,200,202[citing as example of "causal relation"
a shooting intended to aid escape from robbery scene]).

36

The record must evidence "objective facts that connect the act resulting in death to the felony the non-killer committed or attempted to commit"(id at 205). "[T]he circumstances connecting the felony to the killing must be shown by sufficient evidence to justify a reasonable inference that the relationship went beyond mere coincidence of time and place: 'The causal relationship is established by proof of a logical nexus'"(People-v-Dominguez 22 C.R.3rd at 259 quoting Cavitt at 205[Dominguez' emphasis]).

"Cavitt" found the requisite nexus from evidence the robbery victim accidentally suffocated as a result of being bound and gagged and beaten in order to facilitate the robbery(at 202). Moreover, even if the killer killed out of "personal animus" unrelated to robbery, causation was demonstrated. The robbers' tying and beating of the victim "left her unable to resist [the killer's] murderous impulses"(at 204,209-10).

In "People-v-Dominguez," Dominguez was convicted of rape and felony-murder. The victim was beaten and strangled. Dominguez testified he had consensual sex with the victim and then left her alive with his alleged co-perpetrator, Martinez(at 253). The Court of Appeal found the Trial Court had erred in not instructing on the standard of complicity for a non-killer accomplice(the "Cavitt" rule)(at 255-56). Although the jury concluded Dominguez raped the victim, the Court deemed the instructional error prejudicial because the jury apparently had doubts that Dominguez, rather than Martinez, was the killer(id at 256-57).

The jury was "deprived not only of legal guidance, but of any solid evidentiary basis on which to determine what involvement, if any, defendant had in the killing"(at 257-58)...[T]he vagueness

37

of the evidence [which consisted solely of Dominguez' testimony]
makes it impossible to say with confidence what happened on that
night beyond the fact that [the decedent] was sexually penetrated
by defendant, brutally assaulted, and ultimately killed. The se-
quence of these events, and the identity of the author of the latter
two, is a matter for speculation and surmise"(at 258). As such,
"the evidence failed entirely to establish articulable 'objective
facts' establishing a causal connection between the rape and [the]
killing"(at 259; see at 258["...any attempt to determine the relation-
ship ---if any -- between the rape and the killing was inherently
tinged with conjecture"]).


     1. The Instant Case.

     Assuming a robbery in this case (i.e., that Brown's property
was taken by force or threat), all the evidence established is
that the killing concurred in time and place with the robbery.
That's it. California law requires more. There is no evidence
the robbery and killing were causally related. There is no evi-
dence Petitioner himself killed Brown. As far as the record shows,
the killing could well have been committed by Harris in a manner
unrelated to the robbery. If so, Harris was not "jointly engaged"
in the robbery when he killed Brown and Petitioner is innocent of
felony-murder. Evidence equally consistent with innocence cannot
support an inference of guilt(CALJIC no. 2.01; Mikes-v-Borg 947
F.2nd 353,357-60-9th Cir.1991).

     Indeed, the evidence suggests Harris shot Brown while Petition-
er was some 20 yards away(RT-256-57) either before or after taking
of property. Thus, the record does not demonstrate any robbery-

related acts by Petitioner or Harris somehow contributed to Brown's death.  In other words, there was no "solid evidentiary basis on which to determine what involvement, if any, [Petitioner] had in the killing"(Dominguez at 257-58).  The vagueness of the evidence makes it "impossible to say with confidence what happened" beyond that Brown was robbed and ultimately killed.  The existence of a causal connection is thus "a matter for speculation and surmise"(id at 258).

There is no evidence, for example, the gun accidentally discharged while being pointed at Brown during the robbery.  Indeed, there is no evidence the gun was used at all to facilitate a robbery or was present for that purpose.  There is no evidence Brown resisted and had to be shot.  There is no evidence he was shot before, rather than after, the property was taken.  There is no evidence of robbery-related acts (such as beating or binding) which made Brown particularly vulnerable to being shot(compare Cavitt).  There is no evidence the shooting was intended to aid an escape.  In sum, there is no evidence Petitioner in any way contributed to Brown's death.

Analogous is "Mikes-v-Borg"(947 F.3rd 353-9th Cir.1991), wherein the Ninth Circuit concluded that Mikes' fingerprints on a murder weapon was insufficient to identify him as the killer: "While the Government need not exclude all inferences or reasonable hypotheses consistent with innocence...the record must contain sufficient probative facts from which a factfinder could reasonably infer a defendant's guilt...[thus] there must, at the very least, be sufficient evidence in the record to permit the factfinder to determine when the prints were impressed; otherwise, any conviction

39

would be based on pure speculation"(at 357). Because the weapon, a turnstyle post, had been publicly accessible before the killing, the evidence was "wholly insufficient to preclude the reasonable possibility that Mikes' fingerprints were placed on the posts [prior to the time of the crime]"(id at 357-60).

Similarly, there is a reasonable possibility, not foreclosed by the record, the killing in this case was not connected to the robbery. Senseless and purposeless killings happen all the time. As such, the evidence of causation was insufficient(Mitchell-v-Prunty 107 F.3rd 1337,1342-9th Cir.1997; id at 1341 & fn.8[evidence of guilt of murder insufficient absent evidence Mitchell's acts caused victim's death]).

B. Malice-Murder Theory.

There was insufficient evidence to support the prosecution's malice-murder theory as well(RT-1070-72; CALJIC no. 8.20). There is no evidence of premeditation, deliberation or intent to kill on Petitioner's part(see above at 30-31; People-v-Williams 16 C.4th 635,690-1997["[T]he manner in which the actual perpetrator committed the murders (execution style) did not itself reveal an intent to kill by defendant as an aider and abettor"]; People-v-Woods 8 C.A.4th 1570,1586-91-1992[noting that, depending on the evidence, defendant may be guilty of lesser degree of murder than perpetrator).

GROUND SIX-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS
WAS VIOLATED BY INSUFFICIENT EVIDENCE.

There was insufficient evidence the killing was committed to
further or advance the robbery or the escape therefrom.  The felony-
murder special circumstance is thus invalid(Denard-v-Dir. Dept. of
Corrections 967 F.S. 387,392-93-C.D.Cal.1997[applying "Jackson-v-
Virginia" sufficiency analysis to felony murder special circumstance
finding]).

As the jury was instructed, to impose the felony-murder special
circumstance, which triggered Petitioner's sentence of life without
parole, it had to find "the murder was committed in order to carry
out or advance the commission of the robbery or to facilitate the
escape therefrom or avoid detection.  In other words, the special
circumstance...is not established if the robbery was merely incident-
al to the commission of the murder"(CALJIC no. 8.80.1; RT-1077).

The special circumstance "involves proof of the intent of the
accused.  A murder is not committed during a robbery within the
meaning of the [special circumstance] unless the accused has killed
in cold-blood in order to advance an independent felonious purpose"
(People-v-Kimble 44 C.3rd 480,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; accord Williams-v-Cal-
deron 52 F.3rd 1465,1476-9th Cir.1995; People-v-Thompson 27 C.3rd
303,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[special circumstance inapplicable "when the whole
record [was] viewed in a light most favorable to the verdict, it
establish[ed] at most a suspicion that [defendant] had an intent
to steal independent of his intent to kill"]; People-v-Green 27
C.3rd 1,59-62-1980[felony-murder special circumstance inapplicable
when murder not intended to further robbery]).

41

As shown, the record is simply silent on the precise relation-
ship, if any, between the killing and the robbery(above at 38-39).
There clearly is no sufficient evidence the killer intended to
further the robbery or escape therefrom.   There is no evidence of
what the killer intended by pulling the trigger.   Put another way,
the sparse record is equally consistent with an intent to kill or
injure unrelated to the robbery.   As the burden of proof is on the
prosecution, this is insufficient to sustain the special circum-
stance(Mikes-v-Borg at 357-60; CALJIC no. 8.83[jury is "not permitted
to find a special circumstance...to be true based on circumstantial
evidence unless the proved circumstance is not only (1) consistent
with the theory that a special circumstance is true, but (2) cannot
be reconciled with any other rational conclusion...if the circum-
stantial evidence is susceptible to two reasonable interpretations,
one of which points to the truth of a special circumstance and the
other to its untruth, you must adopt the interpretation which
points to its untruth,"]).

42

GROUND SEVEN-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO EFFECTIVE
COUNSEL WAS VIOLATED.

Should the Court conclude the evidence was technically suf-
ficient to prove felony-murder or the special circumstance, Counsel
was nevertheless ineffective for failing to highlight the record
inadequacies for the jury. Given the paucity of evidence as to
precisely what occurred during the robbery and killing, the record
clearly provided a substantial basis for arguing the prosecution
had not met its burden of proof as to whether Petitioner killed,
as to causation, or as to intent to kill and reckless indifference
(see above at 28-42). Due Process requires proof of guilt beyond
a reasonable doubt(in Re Winship 397 U.S. 358,364-1970).

An attorney is ineffective if (1) his performance falls below
an objective standard of reasonableness, and (2) absent the error,
there is a reasonable probability the jury would have acquitted
(Strickland-v-Washington 466 U.S. 668,688-89,695-1984). Closing
argument "should 'sharpen and clarify the issues for resolution
by the trier of fact'[citation]"(Yarborough-v-Gentry 124 S.Ct. 1,
4-2003). Focusing "on a small number of key points may be more
persuasive"(id at 5). "'A decision not to address an issue,...
should be based on an analysis of the importance of that subject
and the ability of the advocate and the opponent to explain per-
suasively the position to the fact-finder'[citation]"(id).
"Gentry" focused on whether the omitted issues were "clearly more
persuasive than those...discussed" such as to demonstrate ineff-
ectiveness(id at 6).

The importance of proof beyond a reasonable doubt is beyond

43

question. If convinced the "Winship" standard had not been met, the jury was bound to acquit. The defense's ability to explain persuasively the prosecution burden, the offense elements, and how the evidence fell short was clear, particularly as such arguments would have been aided by Court instruction and the evidence.

An "elements" argument would clearly have been more persuasive than Counsel's attacks on witness credibility(RT-1006-31). The jury was free to resolve any credibility issues against Petitioner. However, Counsel should have argued that, even crediting prosecution testimony Petitioner was complicit in a robbery, it was nevertheless insufficient to prove murder and special circumstance liability. Neither Coleman's nor Savage's testimony demonstrated Petitioner killed, intended to kill, or that the killing was caused by, or intended to facilitate, robbery. The jury's ability to reject this argument was severely limited by the record itself(Lord-v-Wood 184 F.3rd 1083,1094-9th Cir.1999[noting Counsel's omissions therein "all the more questionable in light of the weaknesses in the prosecution case"]).

Instead, instant Counsel merely told jurors to "decide for yourself whether or not this is truly a felony-murder situation." Counsel then cited the reasonable doubt standard(RT-1012-13). Counsel failed to clarify exactly how the evidence fell short or to even clarify the felony-murder causation requirement. The felony-murder instruction given did not explain that a non-killer accomplice is not liable for a killing unrelated to the robbery even if the killing occurs during the robbery(RT-1071-73; People-v-Cavitt 33 C.4th 187,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[noting that CALJIC no. 8.27 "simply fails to inform the jury of this principle"]). It is

44

on this precise point on which the evidence fell short(see above at 36-40).

Worse, Counsel implied it was irrelevant which robber shot Brown(RT-1016-17). To the contrary, the identity of the shooter was critical: a greater evidentiary showing was required, and lacking, for the non-shooter accomplice(see above at 28,30-35,36-40).

Analogously, "Young-v-Zant"(677 F.2nd 792-11th Cir.1982) found an attorney ineffective for failing to argue an "elements" defense to a murder charge when, "evidence that Young took [the victim's] life with malice aforethought was extremely thin"(at 798[noting Counsel also neglected "obvious defenses" to murder-robbery theory]). "Young" concluded the attorney's failures "indicates such a lack of preparation and exercise of skill that we do not hesistate to conclude his conduct fell far short of that required of counsel in a criminal trial"(at 799; Tejada-v-Dubois 142 F.3rd 18,24-25-1st Cir.1998[attorney ineffective when failure to competently argue defense theory "took the question away from the jury"]; U.S.-v-Swanson 943 F.2nd 1070-9th Cir.1991[same when attorney conceded guilt of offense during argument]).

If Counsel did not recognize the glaring weaknesses in the prosecution case, he was deficient. The evidence of causation, intent to kill, and reckless indifference, at best, was "extremely thin"(Strickland at 691[requiring Counsel decisions be made with full knowledge "of law and facts relevant to plausible options"]; Avila-v-Galaza 297 F.3rd 911,919-9th Cir.2002[Counsel deemed deficient when omission resulted from unfamiliarity with facts of case]). Counsel had a duty "to make the adversarial testing process work"(Strickland at 690). An indispensible component of

45

that process is the reasonable doubt standard and focused argument.

In the alternative, if Counsel thought an "elements" argument inconsistent with the defense arguments he made, he was still deficient.  Counsel could have presented an elements argument in tandem with his misidentification arguments(Rios-v-Rocha 299 F.3rd 796,806 fn.18-9th Cir.2002[noting that choice of one defense over another would likely be deficient when "a trial strategy could be formulated in which the defenses would be complementary rather than conflicting"]).


Petitioner was prejudiced by Counsel's omissions.  Prejudice in this context does not require proof the evidence was constitutionally insufficient(Lord-v-Wood at 1096[Counsel's error prejudicial despite fact jury could still have convicted in its absence]; Strickland at 693[proof of prejudice does not require showing "Counsel's conduct more likely than not altered outcome in the case"]).  "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"(Strickland at 696).

Counsel's error in this case "undermines confidence in the outcome"(Strickland at 693).  The evidence is so thin on the elements as to call Petitioner's guilt into question.  It is very likely a jury focused on that fact would have acquitted(Hart-v-Gomez 174 F.3rd 1067,1072-73-9th Cir.1999[Counsel's error prejudicial when evidence of guilt "far from overwhelming"]; Phillips-v-Woodford 267 F.3rd 966,982-83-9th Cir.2001[same when jury may have entertained doubt special circumstances elements proven]; Rios at 810 [same when "the state's case against Rios was at best a close

46

one"]; U.S.-v-Span 75 F.3rd 1383,1390-9th Cir.1996[defendant prej-
udiced when "highly likely" jury would have acquitted absent counsel's
error]).

GROUND EIGHT-PETITIONER'S FEDERAL CONSTITUTIONAL RIGHTS TO DUE PRO-
CESS AND EFFECTIVE COUNSEL WERE VIOLATED.

Due Process.

A pretrial identification procedure may violate Due Process
if "unnecessarily suggestive" and conducive to mistaken identifi-
cation.  Due Process is violated if there is a substantial like-
lihood of irreparable misidentification(Manson-v-Brathwaite 432
U.S. 98,104-1977).

Witness Savage picked codefendant Harris out of a line-up(RT-
780,783,219).  In a separate, May 24, 2000 line-up containing Pet-
itioner in position #3, Savage did not identify Petitioner.  Savage
instead indicated innocent "fillers" in positions #1 and #5 as
possibly being the second suspect(RT-270,830; att.ex. (attached
exhibit) A-5,2-3).  On 6-14-2000, Savage recontacted investigators
and informed them (1) he'd learned from a news broadcast Petitioner
had been arrested in the case and (2) that Savage had known Pet-
itioner years before the shooting.  Savage asked Seargent Medieros
if Petitioner had been in the line-up or in position #1(att.ex.
A-5).  Savage also told Medieros he might be able to recognize
Petitioner in a courtroom(id).

At the preliminary hearing, on August 15, 2000, Savage iden-
tified Petitioner sitting at the defense table in jailclothes
(1PHT[preliminary hearing transcript]-120).  The foregoing circum-
stances were undeniably, unnecessarily, and unduly suggestive
and tainted both the preliminary hearing identification and Sav-
age's subsequent identification at trial(RT-254,255).  The ad-

48

mission of each identification at trial violated Due Process.    "An
identification procedure is suggestive when it 'emphasizes the focus
upon a single individual' thereby increasing the likelihood of
misidentification"(U.S.-v-Montgomery 150 F.3rd 983,992-9th Cir.1998).

     In this case, Petitioner was unfairly "emphasized as the focus
of the investigation."  It was unmistakably conveyed to Savage po-
lice believed Petitioner guilty.  First, Savage saw Petitioner in
the line-up (although he did not identify Petitioner)(Marsden-v-
Moore 847 F.2nd 1536,1545-46-11th Cir.1988[Photo identification
procedure suggestive even though witness did not identify Marsden
in photo because procedure gave witness "a frame of reference for
her later in-court identification of Marsden"]).  Savage then re-
ceived information Petitioner was arrested in connection with the
case.  Savage then saw Petitioner together with Harris (whom Sav-
age had already identified-RT-219) in court before Savage testified
(2PHT-55-56).  Finally, Petitioner was brought into court clad in
jail clothes clearly marking him as a defendant and placed at the
defense table.  It was then that Savage, unsuprisingly, identified
Petitioner(1PHT-120,119).  As such, the identification procedure
was unduly suggestive(U.S.-v-Montgomery at 992[Procedure suggestive
when witness shown photos of Montgomery and allowed to view him in
courtroom before identification on stand]; Thigpen-v-Cory 804 F.2nd
893,895-96-6th Cir.1986[Defendant's appearance in line-up and sub-
sequent court proceedings related to investigation, including once
with a man the witness had already identified, unduly suggestive]).

     Several factors are relevant to determining whether the above
procedures gave rise to a substantial likelihood of misidentifica-

49

tion.  "These include the opportunity of the witness to view the
criminal at the time of the crime, the witness' degree of attention,
the accuracy of his prior description of the criminal, the level of
certainty demonstrated at the confrontation, and the time between
the crime and the confrontation.  Against these factors is to be
weighed the corrupting effect of the suggestive identification it-
self"(Manson-v-Brathwaite at 144; U.S.-v-Montgomery at 993).

     These factors apply in determining the admissibility of both
the pretrial identification and the in-court identification(Neil
-v-Biggers 409 U.S. 188,198-1972; Tomlin-v-Myers 30 F.3rd 1235,
1241-9th Cir.1994[Finding testimony about previous illegal lineup
inadmissible]).  The bottom line is whether the identification
resulted from the suggestiveness or from the witness' observation
of the crime(Tomlin at 1240-41[citation][Government must prove
"'by clear and convincing evidence that the in court identification
was based upon observations of the suspect other than the lineup
identification'"]).


     In this case, Savage saw the two suspects twice, once outside
his building (from a distance of 10-15 feet)(RT-251-57,275) and
once after the shooting near Brown's car (from an estimated dis-
tance of 50 yards)(RT-282,831).  The "Manson" analysis should be
made with reference to the first, up close, encounter as it is
unlikely Savage could see any faces or facial details from 50
yards away.  Although not clear from the record, but as Savage's
testimony and statements suggest(RT-250-55,277; att.ex. B at 3),
he most likely identified the men near Brown's car solely by their
clothes and skintone, which he had noted while he was close to

them(att.ex. B at 2-3,4-5,3(part 2)).  One was light-skinned, the
other darker(RT-277-78,283).  One (identified as Harris) had on
light pants, the second had dark pants(RT-276,288).  Indeed, given
that the burden is on the prosecution to prove the identification
independent of the suggestiveness(Tomlin-v-Myers at 1240), it
should be presumed absent evidence to the contrary that Savage could
not make out the suspects' faces from 50 yards away.


A. Opportunity to View.

     Savage observed the two men outside his home for just 1-2
minutes(1PHT-89).  During that time, his attention was divided be-
tween them(RT-250-54).  Savage saw the individual identified as
Petitioner full face for only about five seconds and from 14-15 feet
away(RT-287; 1PHT-88).  Moreover, Savage did not note any disting-
uishing features of the suspect in profile(1PHT-100,103).


B. Degree of Attention.

     Savage testified he was more concerned with his safety than
with noting details regarding the suspects(RT-291; 1PHT-89,99-101,
103-04,110,122).  His attention was more acute as to the suspect
identified as Harris than as to the suspect identified as Petitioner.
This is so because the former was standing (and light-skinned) while
the latter sat(RT-253,260,267,277,274-75,283; 1PHT-96-97).  Accord-
ingly, Savage identified Harris during a line-up(RT-269-70; Raheem
-v-Kelly 257 F.2nd 122,142-2nd Cir.2001, see at 138[identification
of defendant as shooter unreliable when witness paid closer att-
ention to shooter's companion]).

C. Accuracy of Description.

Any accuracy in Savage's description is undercut by its gener-
ality. He described the sitting suspect as a black male, dark, 25
and 175 pounds(att.ex. D at 4; att.ex. B at 6). The description
could apply to any number of people. He gave only one detail per-
taining to the suspect's face: "bubbly eyes"(RT-254,289). "Accur-
acy also refers to how particularly a description matches a suspect"
(Thigpen-v-Cory 804 F.2nd 893,896-97-6th Cir.1986[Court's emphasis]
[Identification unreliable when description accurate, but general];
Marsden-v-Moore 847 F.2nd 1536,1545-46-11th Cir.1988[Same when
description of suspect "very general"]; Rodriguez-v-Young 906 F.2nd
1153,1163-7th Cir.1990[Finding general description weighed against
reliability when "It would fit dozens of men...[and] offers no de-
tails as to the facial features or other more distinguishing char-
acteristics than age, build, and complexion..."]).

Also, Savage's ability to accurately gauge height was impaired
because the suspect was sitting the entire time Savage was near him
(RT-267,274-75,283; att.ex. B at 2).

D. Time Between Crime and Confrontation.

Savage later testified he had recognized Petitioner at the
line-up(RT-294,270; 1PHT-120) which was held just nine days after
the crime(RT-291-92). However, Savage did not identify Petitioner
on that day(RT-785-86). Instead, he pointed out two line-up fil-
lers as possibly being the suspect(RT-830,785-86).

Notwithstanding his excuse for not then identifying Petitioner
(that he was angry with investigators-att.ex. C at 3; see 1PHT
-120), it's clear Savage simply did not then recognize Petitioner

52

either as a suspect or at all.  Supporting this conclusion is the
fact Savage had to ask Seargent Medieros, after the line-up, if
Petitioner was in that line-up(RT-786-87; att.ex. A-5).  He guessed,
wrongly, that Petitioner was in position #1(id; RT-830).  Moreover,
Savage's statement at the time that he might be able to recognize
Petitioner in court(att.ex. A-5), shows Savage had not already
recognized him in the line-up.  It is obvious that the news report
that Petitioner had been arrested made Savage realize, after the
fact, Petitioner might have been in the line-up.

     As such, Savage did not identify Petitioner until three months
after the crime at the preliminary hearing under suggestive cir-
cumstances(1PHT-120).  By then, Savage's memory could have faded
and was subject to being corrupted(Stovall-v-Denrio 388 U.S. 293,301-
1967[Noting that a delay of months would be "a seriously negative
factor" in determing the reliability of an identification]; U.S.-v-
Rodgers 126 F.3rd 655,657-11th Cir.1997[Identification months after
the crime raised serious concerns about accuracy]; People-v-McDon-
ald 37 C.3rd 351,361-1984[Wherein an expert on eyewitness identifi-
cation established that memory is "a selective and a constructive
process, in which the elements fade and are lost while new elements
-- subsequent suggestions or information -- are unconsciously
interwoven into the overall recollection until the subject cannot
distinguish one from the other"]).

E. Certainty of Identification.

     The credibility of Savage's professed certainty in his iden-
tification(1PHT-138) is undercut by the prosecutor's leading ques-
tion(id), Savage's inability to previously identify Petitioner, and

his limited view of the suspect. Further, any true certainty likely
resulted from the aforementioned suggestive circumstances(Raheem-v-
Kelly at 139[Identification unreliable when certainty "engendered
by the suggestive element itself"]; Rodriguez-v-Peters 906 F.2nd at
1163[Noting that "the most certain witnesses are not invariably the
most reliable ones"]; People-v-McDonald at 362[Wherein expert test-
ified that certainty does not equal accuracy with identifications];
see also Cossel-v-Miller 229 F.3rd 649,656-7th Cir.2000[Identifica-
tion unreliable when witness had failed to identify suspect twice
before]; Thigpen-v-Cory 804 F.2nd at 897[Same when witness failed
to identify defendant at line-up]).

F. Additional Factors.

    There is an additional factor tipping the scales toward un-
reliability in this case: Savage apparently knew Petitioner from
years before Savage witnessed the crime(RT-260,785-86,787).  This
brought into play the phenomenon of "unconscious transfer" whereby
"a witness confuses a person seen in one situation with a differ-
ent person seen in another"(People-v-McDonald 37 C.3rd at 374 fn.20).
Such has been recognized by experts as possibly causing misidenti-
fication(id).  Quite simply, Savage could have confused his memories
of Petitioner in a non-criminal context with his memories of the
suspect.  Such confusion would have been helped along by Savage's
knowledge Petitioner was arrested and being tried for the murder.
As noted, Savage did not identify Petitioner until after he saw him
in custody with Harris.  "The witness' recollection of the [suspect]
can be distorted easily by the circumstances or by later actions
of the police"(Manson-v-Brathwaite at 112).

In light of the above, admission of the identifications vio-
lated Due Process.


Ineffective Counsel.

Counsel was clearly ineffective for not moving to suppress the
pretrial identification and to preclude or suppress Savage's trial
identification.   The above "Manson" factors could have been devel-
oped at a suppression hearing.   At the least, Counsel should have
moved at trial to strike the identifications after the relevant
testimony was given(Rodriguez-v-Peters at 1161 fn.14[Concluding
Counsel should have made "colorable" motion to suppress identifi-
cation at trial after relevant testimony]).

"[C]ounsel's failure to file a motion to suppress evidence can
provide the basis for a claim of ineffectiveness"(Van Tran-v-Lindsay
212 F.3rd 1143,1156-9th Cir.2000 citing Kimmelman-v-Morrison 477
U.S. 365-1986).   "When faced with a client who has been identified
in an illegal [or suggestive] line-up, most defense attorneys
would challenge the admission of any evidence related to it.   After
all, a defendant 'arguably has everything to gain and nothing to
lose in filing a motion to suppress'[citation], especially one in-
volving an identification by the sole witness to the crime"(Tomlin
-v-Myers 30 F.3rd at 1238).   "Tomlin" concluded Counsel therein
was deficient for failing to bring a motion suppress a tainted
in-court identification: "The failure to bring to the Court's
attention a major Constitutional error...is not the product of
reasonable professional judgment"(at 1239; Rodriguez-v-Peters at
1160-61[Same when "defense could not have been compromised by a
motion to suppress" and identification was by "only...witness

55

naming the defendant as the murderer"]).

Similarly, instant Counsel had nothing to lose by filing a motion which could have resulted in suppression of the only non-accomplice testimony linking Petitioner to the offense. Savage's claim to have known Petitioner from years before did not justify foregoing a suppression motion.

"Rodriguez-v-Peters" concluded that Counsel therein should have moved to suppress despite the witness' prior acquaintance with Rodriguez(at 1160). The Court explained: "The issue was not whether she recognized [Rodriguez] generally but whether she rec-ognized him as the killer...a motion to suppress...would have been directed...to suppressing any identification of Rodriguez as [a perpetrator]"(id). Similarly, the issue in this case was whe-ther Savage saw Petitioner at the crime scene. As noted, rather than insuring reliability, Savage's prior acquaintance with Pet-itioner may have undermined the identifications(above at 54). As such, Counsel should have moved for suppression.

That failure was prejudicial because Counsel "would have pre-vailed on the suppression motion, and...there is a reasonable probability that the successful motion would have affected the outcome"(Van Tran at 1156 citing Kimmelman at 375; Rodriguez-v-Peters at 1161["Strickland" prejudice dependent on admissibility of identification]).

In this case, acquittal was more than reasonably probable absent Savage's identifications. As noted, the only other evidence linking Petitioner to the crime was the statements and testimony of Coleman(above at 2-5,9,16-17). However, as Coleman was an

56

accomplice, her testimony alone could not support a conviction(RT-1068-69; Penal Code §1111).  Thus, the absence of Savage's identifications, which provided critical §1111 corroboration, would have required acquittal.

GROUND NINE-TRIAL COUNSEL WAS INEFFECTIVE IN VIOLATION OF THE SIXTH
AMENDMENT.

Savage testified he saw Petitioner and Harris outside Savage's
window and around Brown's car when Brown was shot(RT-250-57).
Savage also testified to his preliminary hearing identification of
Petitioner(RT-254-55). Savage did not identify Petitioner in a
line-up but claimed at trial to have recognized Petitioner in that
line-up(RT-270,294). Savage's testimony was critical. He was
the only non-accomplice witness to implicate Petitioner(Penal Code
§1111). Trial Counsel was ineffective for not impeaching Savage's
testimony with adequate cross-examination.

Savage was impeached to some extent. It came out that Savage
had picked two innocent line-up "fillers" rather than Petitioner
as possibly being suspect two (Savage had already identified
Harris)(RT-292-94,785-86). Nor did Savage identify Petitioner
in a subsequent police interview(RT-833; att.ex. B). Savage was
also generally impeached with prior inconsistent statements in-
volving how dark it was that night(RT-262), what the suspects were
wearing(RT-268,275-76,288), his degree of attention(RT-278-79),
whether suspect two had facial hair(RT-289), and if Savage had
noticed any distinct facial features(RT-289-90).

However, Counsel failed to impeach Savage on points which
went to the heart of whether Savage's identifications were to be
believed.

(1) After the line-up, Savage learned from a newscast that
Petitioner had been arrested for Brown's murder. Savage then

58

called Seargent Medieros to ask if Petitioner had been in the line-up(RT-786-87; att.ex. A-5).  Savage also told Medieros he might re-cognize Petitioner if he saw Petitioner in court(att.ex. A-5).

During cross-examination, Savage claimed not to remember the call or his questions to Medieros(RT-294-95).  In accord with in-structions(RT-1053-54), the jury could not consider Counsel's questions on the matter as evidence.  Having been stonewalled by Savage, Counsel was ineffective for failing to bring the evidence in through Medieros and by introducing the written report of the conversation(att.ex. A).  Had Counsel done so, it would have bol-stered the critical inference Savage did not identify Petitioner at the line-up because Savage simply did not recognize him as a perpetrator.  In other words, that Savage had to ask if Petitioner were in the line-up shows he hadn't already recognized Petitioner therein.  Similarly, if Savage had recognized Petitioner, there would have been no doubt he could do so in court.  However, Savage could only state he "might" be able to identify Petitioner in court(att.ex. A-).

Counsel did question Medieros somewhat on the matter.  Medi-eros responded that Savage stated during the call that: "[H]e remembered Mr. Lockhart [Petitioner], and Mr. Lockhart prior and he was trying to ask me if a certain person in the line-up was Mr. Lockhart"(RT-786-87).  Medieros' testimony thus established that Savage had to ask if Petitioner was in the line-up.  However, the testimony did not reveal that Savage had learned from a source other than the line-up (i.e. the news) that Petitioner was in custody.  Nor did Medieros testify Savage was uncertain as to his ability to identify Petitioner.  Medieros' incomplete test-

59

imony thus left the misleading impression either that (1) Savage
had realized, after the fact and based on the line-up alone, that
Petitioner was the perpetrator or (2) that Savage had recognized
Petitioner from the beginning but simply kept silent.

(2) Savage's "identification" at the preliminary hearing very
likely resulted from suggestion.  Counsel should have cross-examined
Savage or otherwise elicited the fact (1) Petitioner was in obvious
jail clothes at the defense table at the preliminary hearing and
(2) Savage had seen Petitioner in court with Harris, whom Savage
had already identified(1PHT-119-20; 2PHT-55-56).    This would have
provided the inference Savage's preliminary hearing identification
resulted, not from his observations of the crime, but from his
knowledge authorities believed Petitioner guilty, Petitioner's
obvious status as a defendant, and Petitioner's association with
someone Savage already believed guilty.

Supreme Court and Circuit authority recognize circumstances
such as those in this case can cause mistaken identification(Manson
-v-Brathwaite, dissent at 120 fn.2 & 133-34[Noting that it is
highly suggestive when a witness knows the defendant "is believed
to be guilty by the police"]; Thigpen-v-Cory 804 F.2nd at 895-96
[Defendant's appearance in line-up and subsequent court proceedings
related to investigation, including once with a man the witness had
already identified, rendered witness' in-court identification of
Thigpen unreliable]; U.S.-v-Montgomery 150 F.3rd at 992[Procedure
suggestive when witness shown photos of Montgomery and allowed to
view him in courtroom before identification on stand]).

The proposition Savage failed to recognize Petitioner in this the line-up would have undermined Savage's "identifications" at the preliminary hearing and trial. The jury would no doubt have wondered how Savage did not recognize Petitioner just nine days after the crime (at the line-up)(RT-785), but could finger him three months later at the preliminary hearing and three years later at trial(see Cossel-v-Miller 229 F.3rd at 656[Identification un-reliable when witness had failed to identify suspect twice before]; Thigpen-v-Cory at 897[Same when witness failed to identify defendant at line-up]). Savage's failure to identify at the line-up would, in turn, have bolstered the inference the preliminary hearing identification was solely the result of suggestion.

Thus, proper cross-examination would have encouraged the in-ference Savage had consistently failed to identify Petitioner until seeing him under highly suggestive circumstances. This conclusion, along with evidence Savage saw suspect two "full face" for just seconds from 14-15 feet away(RT-287), could have led the jury to reject Savage's identification.

Counsel was thus deficient. In "Berryman-v-Morton"(100 F.3rd 1089-3rd Cir.1996), Counsel failed to impeach uncorroborated eye-witness testimony with prior inconsistent statements which called into serious question the identification of Berryman. The Third Circuit found this deficient: "Petitioner's counsel had in his hands material for a devastating cross-examination of [the witness] on the critical issue in the case"(at 1098). It was "wholly un-reasonable" for counsel not to impeach evidence which "cuts directly to the heart of the only evidence against Berryman"(at 1099).

61

In "Nixon-v-Newsome"(888 F.2nd 112-11th Cir.1989), the defendant was convicted based solely on the identification testimony of the victim's wife.  Nixon's attorney failed to impeach with her prior testimony another man was the shooter and that Nixon had no gun. The Eighth Circuit stated: "We have no difficulty concluding that the attorney's actions were not within the wide range of professional competence...The attorney's failure...sacrificed an opportunity to to weaken the star witness' inculpatory testimony"(at 114-16).

In "Moffet-v-Kolb"(930 F.2nd 1156-7th Cir.1991), Moffet's defense theory was that his brother, rather than Moffet, committed the charged attempted murder.  The Seventh Circuit found counsel ineffective for not introducing a prosecution witness' prior state-ments indicating the brother had indeed shot the victim(at 1161-62 [Noting the "statements were critical evidence for Moffet's coun-sel's defense theory"]).

Under "Berryman" and "Nixon," Savage was a star witness in this case, the sole witness identifying Petitioner and providing corrob-oration under §1111.  Counsel had the means to devastate his test-imony but failed to do so.  Nor was his failure a tactical decision. The omitted cross-examination dovetailed perfectly with Counsel's contention that Savage failed to recognize Petitioner at the line-up and that his identifications should not be believed(RT-1028-29; Hart-v-Gomez 174 F.3rd 1067,1071-9th Cir.1999[Finding it "inconciev-able" omission contrary to Counsel's chosen line of defense was strategic]; U.S.-v-Span 184 F.3rd 1083,1095-9th Cir.1999[Counsel deficient for not introducing evidence which "dovetailed with their defense"]; Lord-v-Wood 75 F.3rd 1383,1389-90-9th Cir.1996[Counsel's failure to request instruction which would bolster defense not

strategic]).

As demonstrated(above at 56-57), there is more than a reason-
able possibility that rejection or absence of Savage's testimony
would have resulted in acquittal(Berryman at 1102[Failure to impeach
prejudicial when "Berryman's guilt rested entirely on the accuracy
of [the unimpeached] identification"]; Nixon at 115[Same when other
evidence against Nixon "far from overwhelming"]; Moffet at 1161-62
[Same when strongest evidence against Moffet was inconclusive]).

63

ATTACHED RELEVANT TRANSCRIPTS

39-41,46-48 - OPENING ARGUMENTS REGARDING HARRIS STATEMENT

72-73 - CORONER TESTIMONY

125-59,170-241,301-14,373-75,852 - TESTIMONY AND STATEMENTS OF

PAULINE COLEMAN

248-99 - TESTIMONY OF ENZORE SAVAGE

281,448-56,503,529-32,571-74 - THREAT EVIDENCE

562-63,690-95,702,711-12 - BALLISTIC EVIDENCE

627-33 - PAWN RECORDS TESTIMONY

773-74 - ADMISSION OF HARRIS STATEMENT

780-90,829-33 - TESTIMONY RELATED TO SAVAGE AND LINE-UP

819-20 - TESTIMONY ABOUT RESTRAINING ORDER

400-04,874-75,1107 - COLEMAN'S PLEA AGREEMENT

956-58,971,991-95,1000-04,1033-36,1040 - CLOSING ARGUMENTS (PROSECUTOR

AND COUNSEL FOR HARRIS)

1006-031 - CLOSING ARGUMENT (COUNSEL FOR PETITIONER)

1053-54,1056-57,1062-63,1068-69,1070-77 - PERTINENT JURY INSTRUCTIONS

1110 - TRIAL COURT STATEMENT


1PHT-85-141 - SAVAGE PRELIMINARY HEARING TESTIMONY

2PHT-32-58 - SAVAGE PRELIMINARY HEARING TESTIMONY

# EXHIBIT COVER PAGE



EXHIBIT

Description of this Exhibit: LINE- UP REPORT

Number of pages to this Exhibit: ___5___ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

OAKLAND POLICE DEPARTMENT
455 - 7th Street
Oakland, CA 94607

**ADDITIONAL INFORMATION REPORT**

RD # 00-44120

| CRIME | SUPPLEMENTAL | INCIDENT # | VICTIM LAST, First, Mid. |
|---|---|---|---|
| 187 PC | | V1 | Brown  Gerald |

| SUSPECT LAST, First Mid. | INCIDENT LOCATION | DATE OF THIS REPORT | ORIGINAL DATE REPORTED |
|---|---|---|---|
| LOCKHART.  Eric | I to  555 Bancroft | 24 MAY00 | 15 MAY00 |

**PROPERTY (and/or NARRATIVE)**

| ITEM # | QNTY. | ITEM TYPE, BRAND, MODEL #, SIZE, COLOR, MARKS, ETC | SERIAL # | VALUE |
|---|---|---|---|---|

Summary - On 24 MAY00, SGT. L. Cruz & I conducted a physical lineup, with Susp LOCKHART, in regards to this murder.

About 1905 hours, I reviewed the physical lineup Card with witness Savage, who indicated he understood the instructions & signed the Card

About 1910 hrs, I observed the lineup participants, which Susp LOCKHART picked. I noted filler Johnny Powell was only 5'6", & weighed about 198 lbs. I removed Powell from the line, due to his physical not being similar to LOCKHART. LOCKHART then picked Arthur Sims as the replacement for Powell.

I allowed LOCKHART to set the lineup order, which he set as the following:
1. Arthur Sims
2. Edward Mitchell
3. LOCKHART, Eric
4. Darnell Young
5. Mardy Coleman
6. Margdis Morton

The lineup began about 1920 hrs & was videotaped by SGT. Cruz. The lineup was conducted in the normal manner, with each participant stepping to the center microphone individually, making four (4) quarter

| REPORTED BY | SERIAL # | WATCH | DISTRICT | SUPERVISOR | SERIAL # | PAGE |
|---|---|---|---|---|---|---|
| SGT Medeiros | 7774C | CEO | LTD Berlin | | 1 OF 2 |

TF-3044 (4/NOV84)

**OAKLAND POLICE DEPARTMENT**
455 · 7th Street
Oakland, CA 94607

**OPD**

**ADDITIONAL INFORMATION REPORT**

RD # 00-44120

| CRIME | SUPPLEMENTAL | INCIDENT # | | VICTIM LAST, First, Mid. | |
|-------|--------------|------------|---|---|---|
| 187 PC | | | V1 | Brown Gerold | |

| SUSPECT LAST, First Mid. | INCIDENT LOCATION | DATE OF THIS REPORT | ORIGINAL DATE REPORTED |
|---|---|---|---|
| LOCKHART. Eric | IFO 555 Barrivale | 24 MAY00 | 15 MAY00 |

**PROPERTY (and/or NARRATIVE)**

| ITEM # | QNTY. | ITEM TYPE, BRAND, MODEL #, SIZE, COLOR, MARKS, ETC | SERIAL # | VALU |
|--------|-------|---|---|---|

(cont) turns. Walking to the N/wall, turning &
Walking to the South wall, returning to the
Center microphone, then returning to the line.
None of the participants were asked to
Speak, nor wear any particular Clothing.
As a group, I had the line make a series of turns.
At Witness Savage's request, I had
the line as a group turn
towards the N /wall, for a short
period of time.

The lineup ended about 1929 hrs, &
I asked Savage to mark his
lineup Card, if applicable.
Savage then placed "?" on
fillers number #1, #5

| REPORTED BY | SERIAL # | WATCH | DISTRICT | SUPERVISOR | SERIAL # | PAGE 2 OF 2 |
|---|---|---|---|---|---|---|
| S67 Medina | TTK | C10 | LT | Berlin | | |

TF-3044 (4NOV94)

ORI 00

IDENTIFICATION SHOW-UP RECO
OAKLAND POLICE DEPARTME

| DATE AND TIME OF SHOW-UP | R.D. NUMBER | | | | | | |
|---|---|---|---|---|---|---|---|
| 24 MAY 00 · 1900 | 00-44120 | TF-880 (1/80) | | | | | |

| Show-up Position | SUBJECTS IN SHOW-UP (INDICATE SUSPECTS BY CHECK MARKS IN MARGIN) | SEX | RACE | AGE | HEIGHT | WEIGHT | ARREST NUMBER | O.P.D. NUMBE |
|---|---|---|---|---|---|---|---|---|
| 5 | COLEMAN, MANDY | M | B | 30 | 601 | 130 | 12809 | A51846 |
| 2 | MITCHELL, EDWARD | M | B | 46 | 511 | 150 | 12764 | ADB747 |
| | POWELL, JOHNNY | M | B | 44 | 506 | 198 | 12847 | A1H858 |
| 4 | YOUNG, DARNELL | M | B | 21 | 602 | 170 | 12777 | B1804 4 |
| 6 | MOUTON, MARQUIS | M | B | 20 | 5-8 | 145 | 12639 | B15K 56 |
| 3 | LOCKHART, ERIC · 18 | M | B | 38 | 601 | 165 | 12760 | AQC136 |
| 1 | SIMS, ARTHUR | M B | | 19 | 6 0 | 160 | 12871 | BA1816 |

| OFFICER REQUESTING SHOW-UP | SER. NO. | OFFICER CONDUCTING SHOW-UP | SER. NO. | JAILER PRESENT AT SHOW-UP | SER |
|---|---|---|---|---|---|
| SGT. B. Medeiros 7774 | | P. Peroie 7774 | | Furtado | 4118 |

INVESTIGATING OFFICERS PRESENT AT SHOW-UP – NAMES AND DIVISIONS  SER
SGT CMT 7369C

PHOTO OFFICER
Cruz

ATTORNEY PRESENT AT SHOW-UP     REMARKS:
None



RD NO. 00-44120   DATE 24 MAY 00
WITNESS'S NAME  Savage, Enzor

LINEUP CARD
OAKLAND POLICE DEPARTMENT
TF-637 (8/83)

1   2   3   4   5   6   7   8

A.  IF THE SUSPECT IS PRESENT, PLACE AN (X) ON THE CHEST OF THE FIGURE ABOVE THAT IS MARKED WITH THE SAME NUMBER AS THE SUSPECT.

B.  IF THE SUSPECT IS NOT PRESENT, DO NOT MARK ANY FIGURE.

C.  IF YOU BELIEVE A PERSON WHO IS PRESENT IS THE SUSPECT, BUT YOU ARE NOT SURE, PLACE A QUESTION MARK (?) ON THE CHEST OF THE FIGURE THAT IS MARKED WITH THE SAME NUMBER AS THAT PERSON.

D.  PLEASE DO NOT MARK YOUR CARD UNTIL THE LINEUP HAS BEEN COMPLETED.

INSTRUCTIONS

YOU ARE ABOUT TO SEE AND PARTICIPATE IN A LINEUP CONDUCTED
BY THE OAKLAND POLICE DEPARTMENT.  THE FOLLOWING PROCEDURES
WILL BE USED:

1.  THE LINEUP WILL BE CONDUCTED BY

    _SGT B. Medeiros_

2.  THE PLACE OF THIS LINEUP IS

    _Oakland Police Dept. Line Up Room_

3.  DO NOT DISCUSS YOUR CASE WITH OTHER WITNESSES, OR ANYONE
    IN THE LINEUP ROOM.

4.  DO NOT SIT NEXT TO SOMEONE WHO IS A WITNESS IN YOUR CASE.

5.  THE INDIVIDUALS YOU WILL BE SHOWN WILL NOT BE NAMED; THEY
    WILL BE ASSIGNED NUMBERS.  IF THE SUSPECT OR SUSPECTS IN
    YOUR CASE ARE IN THE LINE, REMEMBER THEIR NUMBERS.

6.  DO NOT CALL OUT A PERSON'S NUMBER, OR DO OR SAY ANYTHING
    THAT MIGHT SHOW YOU HAVE IDENTIFIED SOMEONE IN THE LINE.

7.  IF YOU WISH TO HAVE A CERTAIN PERSON IN THE LINE SPEAK,
    WEAR A HAT, WALK RAPIDLY, ETC., MAKE THIS REQUEST TO THE
    INVESTIGATOR CONDUCTING THE LINEUP, AND ALL MEMBERS IN
    THE LINEUP WILL BE ASKED TO DO THE SAME THING.  NO MEMBER
    IN THE LINE WILL BE SINGLED OUT TO SPEAK OR PERFORM.

8.  IF YOU IDENTIFY ANYONE, PLEASE TELL THE INVESTIGATOR IF
    THE PERSON'S APPEARANCE HAS CHANGED IN ANY WAY.  TELL
    THE INVESTIGATOR AFTER THE LINEUP IS COMPLETED.

9.  DO YOU UNDERSTAND THE INSTRUCTIONS?  ☒ YES  ☐ NO

    _____
    WITNESS'S SIGNATURE

- PLEASE REVIEW THE INFORMATION ON THE REVERSE SIDE -

OAKLAND POLICE DEPARTMENT
455 7th Street
Oakland, CA 94607

**ADDITIONAL INFORMATION REPORT**

RD # OO-44120

| CRIME | SUPPLEMENTAL | INCIDENT # | | VICTIM, Last, First, Mid. |
|---|---|---|---|---|
| 187PC | | | V1 | Brown Gerald |

| SUSPECT, Last, First, Mid. | INCIDENT LOCATION | DATE OF THIS REPORT | ORIGINAL DATE REPORTED |
|---|---|---|---|
| LOCKHART, Harris Coleman | IFO 555 Bancroft Ave | 20 JAN 00 | 15 May 00 |

**PROPERTY (and/or) NARRATIVE**

| ITEM # | QNTY. | ITEM TYPE, BRAND, MODEL #, SIZE, COLOR, MARKS, ETC | SERIAL # | VALUE |
|---|---|---|---|---|

Summary- About 1420 hrs, 14 JAN 00, I received a phone call from witness E. Savage, who told me the following. Savage said he had prior contacts with susp LOCKHART (several years ago), and knew his brother Michael LOCKHART. Savage said he learned Eric LOCKHART was arrested & charged via the news. Savage then asked me if LOCKHART was "number #1" in the physical lineup. I didn't respond to this question. Savage then said he might recognize LOCKHART's face, as knowing him from the past, in a courtroom.

I phoned DDA S. Jackson w/ the above info, leaving a message concerning Savage's comments.

On 20 JAN 00, at 1300 hrs, I spoke with Lansing Lee, who advised ballistic work has not yet been conducted on this case.

On 20 JAN 00, about 1330 hrs, I spoke with Stuart of Criminalistics, who advised the fingerprint work on this case has yet to be completed.

| REPORTED BY | SERIAL # | WATCH | DISTRICT | SUPERVISOR | SERIAL # | PAGE |
|---|---|---|---|---|---|---|
| SGT Medeiros | 77MC | C10 | | LT Berlin | | 1 OF 1 |

TF-3044 (4NOV94)

ORI 00109

# EXHIBIT COVER PAGE

B

EXHIBIT

Description of this Exhibit: TAPE- TRANSSCRIPT

Number of pages to this Exhibit: __15__ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

People vs. Eric Lockhart
Interview with Enzor Savage
5/22/2000

| 1 | ME: | Yes, good evening, today is the 22nd of May, the year 2000. I'm Sergeant Brian Medeiros |
| 2 | | of the Oakland Police Department. I'm in CID room 203 with my partner, Sergeant Lou |
| 3 | | Cruz and Mr. Enzor Savage. Mr. Savage for the tape, would you please spell your last |
| 4 | | name and give us your birth date please? |
| 5 | SA: | S A V A G E 7/29/54 |
| 6 | ME: | Okay, just for documentation, I don't think I stated the time, we have 7:51 p.m., 1951 |
| 7 | | hours. Now a little while ago, Mr. Savage, uh, we had you attend a physical lineup, |
| 8 | | correct? |
| 9 | SA: | Correct |
| 10 | ME: | And we reviewed the lineup cards together front and back and you signed that you |
| 11 | | understood the instructions. You ended up putting an X on a number on the lineup card, |
| 12 | | correct? |
| 13 | SA: | Yeah |
| 14 | ME: | And you put an X onto what number? |
| 15 | SA: | 3 |
| 16 | ME: | Okay. Who do you believe number 3 to be. |
| 17 | SA: | The same person who I saw on the side of the building, same person who if I'm not |
| 18 | | mistaken who was crossing the street walking away from the Continental. |
| 19 | ME: | Okay, now is this going back to this last, I guess it would be late Sunday night, Monday |

1

1          morning?

2    SA:   Yeah, yeah it was Sunday, it was Sunday night (inaudible)

3    ME:   Now you thought, now you said what about this guy being outside the apartment? Outside

4          your place?

5    SA:   I saw him he was the one who stood out more than anybody because I could, well,

6          (Inaudible) I first saw that head, I knew it was him.

7    ME:   Okay, where did you first see Number 3.

8    SA:   On the side of my building.

9    ME:   Okay and the address there, Sir?

10   SA:   5515 Hilton Street.

11   ME:   Did you see Number 3 again that night?

12   SA:   I saw him across the street.

13   ME:   Okay and do you know what the address is across the street?

14   SA:   Shoot, 56, 55, I never paid that address any attention?

15   ME:   Would that be the 5500 block of Bancroft

16   SA:   Yeah

17   ME:   In regards to that homicide investigation my partner and I met you on.

18   SA:   Yes.

19   ME:   Uh, exactly where did you see number 3.

20   SA:   I saw him standing by the Continental.  It was standing there, he wouldn't leave, he just

21          stood there and I really started recognizing when he walked away and he got past the

22          Continental and he got towards the little burgundy little Blazer or whatever they call it,

2

1   that's when I put it together, that's the same guy who was on the side of the building but

2   he had on white pants at the time.

3 ME: And the Continental he was next to, what color was that?

4 SA: Continental? It looked like it could be eggshell, yellow white.

5 ME: And, you, you ended up going over there, correct?

6 SA: Yes, I did.

7 ME: Was there, did you find out was there every anybody in that white Continental (inaudible)

8 SA: (Inaudible)

9 ME: And who was that in the Continental?

10 SA: Cross the street neighbor.

11 ME: And that was the victim of the crime?

2 SA: Yes.

13 ME: Okay, uh, and not too long ago, I believe I saw your I believe it was four photos of the

14   vehicle, a couple of photos of the exterior and I think one of the interior. Is that correct?

15 SA: Yeah, (Inaudible)

16 ME: Okay. Did that vehicle look familiar.

17 SA: It looked like the vehicle.

18 ME: And what vehicle would that be Sir?

19 SA: It's a Cadillac Coupe de Ville. And, uh, the only thing I knew that really stood out about

20   that car was the arm rest. Most Cadillacs come with two arm rests. That one had the big

21   fat one. I remember looking at that car, I remember gazing in and looking at the arm rest.

22 ME: How many arm rests.

| | | |
|---|---|---|
| 1 | SA: | Its only one big fat one, that's how I remember that car. |
| 2 | ME: | Just like the photos you saw tonight? |
| 3 | SA: | Just like the one in the photo. |
| 4 | ME: | And that Cadillac you're talking about, does that vehicle, where do you think you've seen |
| 5 | | that vehicle before? |
| 6 | SA: | Right in front of my house, apartment building rather. |
| 7 | ME: | On Hilton Street. |
| 8 | SA: | On Hilton Street. |
| 9 | ME: | And, this is in regards to the past Sunday night, Monday morning, the 15th of May of the |
| 10 | | year 2000. |
| 11 | SA: | Yes. |
| 2 | ME: | Sergeant Cruz? |
| 13 | CR: | Just a couple of questions. |
| 14 | | Now, the man that you identified tonight, Mr. Savage, what color pants was he wearing |
| 15 | | that night. |
| 16 | SA: | If I'm not mistaken they were white. |
| 17 | CR: | Okay, the other man that you saw, what color pants was he wearing? |
| 18 | SA: | I couldn't really tell what color, what he was wearing. They both had on leather coats. |
| 19 | | He broke and ran, all I remember maybe really distinguishing him, is I looked at the guy |
| 20 | | and as he got coming closer to me, going down Bancroft, it rang like through my head, I |
| 21 | | remember looking in my window in the Cadillac when he was pulling off and I remember |
| 22 | | the guy had on a leather coat and light pants and I remember that. (Inaudible) but I |

4

1         remember he had on white pants. Jeans

2    CR:  Did you see the driver of the Cadillac?

3    SA:  No, I didn't, I mean you know, the guy that I just picked out is the one that had on the

4         white jeans and the leather coat.

5    CR:  Right.

6    SA:  When I looked through my window, I could remember seeing white pants through the

7         window looking down when they were pulling off, but I didn't want to turn my lights on

8         or nothing and let them see me looking at them, you never know what's going on. So I

9         just glazed through a crack in my window and I watched them pull off (inaudible)

10   CR:  Okay, I don't have any other questions.

11   ME:  Okay, when you saw the white pants in the vehicle, what seat was that?

2    SA:  It was on the passenger seat.

13   ME:  Passenger side.

14   SA:  It was on the passenger side. As a matter of fact, when the gun, after all that happened, I

15        heard that car, the same sound Cadillac had started up and the other gun was driving

16        because the other guy was in the street going come on, and when he got halfway, I heard

17        the car start up. He didn't even get in the car yet by the time the car started.

18   CR:  The guy with the white pants hadn't even gotten in the car?

19   SA:  The one, the light skinned guy didn't even get into the car yet when the other car started

20        up.

21.  ME:  Right now for the tape (inaudible) it looks like you are pointing down towards the lineup

22        room.

5

1    SA:    Well,

2    ME:    That person you are talking about.

3    SA:    Right.

4    ME:    All right, everything you told us the truth, Mr. Savage?

5    SA:    Yeah, sure. Unless you want to hypnotize me, it'll work then too.

6    ME:    Okay. With that, there'll be no hypnotizing, we'll shut the tape off, I've got 1957 hours,

7             7:57 p.m., thank you.

8

9    END OF TAPE

6

1   People vs. Antonio Harris

2   Transcription of Interview with Enzor Savage

3

4

5

6   Medeiros:     we're here with Mr. Enzor Savage. Mr. Savage, did I pronounce your name

7                 correct?

8   Savage:       Yes.

9   Medeiros:     All right. Mr. Savage, for the tape, would you please just spell your last name and

10                give me a birth date.

11  Savage:       S-A-V-A-G-E 7/29/54

12  Medeiros:     Okay. Uh, and you reside here, correct, Mr. Savage?

13  Savage:       Yes I do

14  Medeiros:     Uh, earlier this evening, you gave, uh, statement I believe it was to Officer R.

15                Ward concerning the incident that occurred outside tonight. In your words, why

16                don't you tell us what occurred, then we'll ask questions afterwards.

17  Savage:       About twelve o'clock tonight when I was going to get something out of the

18                kitchen to drink, I could hear some people talking so I went to look out my living

19                room. I didn't turn the lights on, I looked out my living room window, I couldn't

20                see it, so I went back to the kitchen and opened up the window and I could hear

21                them again so then I decided to take a real thorough look. I went downstairs,

22                walked all the way to where, because I thought there was a break-in to one of the

1

| | | |
|---|---|---|
| 1 | | cars, because I noticed two people sitting on the side over here (inaudible) |
| 2 | Medeiros: | And, on what side was that, Hilton itself sir? |
| 3 | Savage: | Right here on Hilton |
| 4 | Medeiros: | Okay. |
| 5 | Savage: | So I walked down and I walked up to the back of a red truck. They were sitting |
| 6 | | right there on the little corner piece that's up there where the fence is. I looked |
| 7 | | down and I asked them what's up. And they said nothing's up, we're just sitting |
| 8 | | here having a drink, and I said "Oh," so I backed up, came around, asked me did I |
| 9 | | have a light when obviously I already knew they had a light because I already saw |
| 10 | | them with the matches. So I told them no and I walked back up the stairs. As I |
| 11 | | was walking up the stairs there was about an 81 or 2 or 3 Cadillac Coup De Ville |
| 12 | | uh, grey or maybe a blue grey with a black top with navy blue with black interior |
| 13 | | sitting in front. As I came up the stairs they got in the Cadillac, started it up. By |
| 14 | | the time I got in the door, I didn't turn my lights on, I just peeked out the window |
| 15 | | at them, okay, got in the Cadillac, pulled up to the corner and stayed there for |
| 16 | | about two or three minutes. I didn't actually watch to see which way they went |
| 17 | | but they had tore off. After that, I got, took off my clothes, got into bed, start |
| 18 | | watching tv and about maybe thirty, forty minutes later, I could hear an argument |
| 19 | | and I could hear a guy hollering. So I didn't go to the window immediately but |
| 20 | | then it sounded like somebody was tapping on a bar door, so this time I decided to |
| 21 | | go to my bedroom window so I jumped out the bed, peeked through the blinds and |
| 22 | | as I was looking, I saw the Continental door, passenger door open. I saw a guy |

2

1          standing over the door, still hollering and he stayed there for a few minutes. Then

2          I noticed another guy coming up from where the phone booth is over here by the

3          transmission or tune up place, hollering come on, "let's go."

4  Medeiros:    And he went west of (inaudible)

5  Savage:      Yes

6  Medeiros:    All right, okay.

7  Savage:      So, the other guy he still stood there so I figured, huh, maybe uh, they was

8          breaking in the car but as he started walking away I realized he was the same guy

9          that was sitting on the side of the building, the light skinned guy, with the bald

10         head, black leather coat on, white pants, white shirt, then I noticed the dark guy,

11         he was telling to come on, the other guy wasn't running. Just walked away, so I

12         didn't think nobody was shot at the time, so I, I know Cadillacs, I've had about

13         three of them. I should of ran to my bathroom window. I heard the car start up

14         and they took off. They didn't drive past this way so they went back the opposite

15         way. I decided to go downstairs and I looked over at the Continental and I tried to

16         dial 911 the first time. I couldn't get through cause they was talking to somebody

17         else so I dialed it again and when I was explaining it to her, it looks like, you

18         know, it could be a car break in or somebody could have been shot, she got to

19         asking questions and then I (inaudible) didn't want to go over towards the car but

20         then I decided to go over towards the car and I noticed the hole in the window so I

21         said okay well then there was (inaudible) so as I (inaudible) bring the ambulance I

22         decided to walk over to the other side, that's when the neighbor of the pink house

3

| | | |
|---|---|---|
| 1 | | came out and she was hollering, "I know him." And I looked and I peeked, took a |
| 2 | | peek and saw the guy slumped over on his stomach, with a red shirt, red shoes on |
| 3 | | and then I told them it looks like the guys dead, we need to the ambulance or |
| 4 | | somebody here and that's that. |
| 5 | Medeiros: | Now, could you go back when you heard the men, I guess outside talking the first |
| 6 | | time tonight, what's uh, you described one guy, light skinned guy with the bald |
| 7 | | head (inaudible) one of the best description (inaudible) to start off. Now the light |
| 8 | | skinned guy, the man, what race, Sir? |
| 9 | Savage: | Still got the (Inaudible) uh, he was a male |
| 10 | Cruz: | Yeah |
| 11 | Savage: | Black, both of them. |
| 12 | Medeiros: | Now, the light skinned guy, let's start with him please. How old do you think he |
| 13 | | was? |
| 14 | Savage: | About twenty five. |
| 15 | Medeiros: | Okay, uh |
| 16 | Savage: | Light skinned, bald headed. It seems like I probably could have seen him |
| 17 | | somewhere before, I just can't place him but it looked like eyes could have been |
| 18 | | maybe not a dark brown but could have, probably been a light brown. He had on |
| 19 | | a black leather coat, white shirt. I didn't see his pants but when I was looking |
| 20 | | through the window they were white. The guy that's darker skinned, may be a |
| 21 | | little shade darker than me. |
| 22 | Medeiros: | Wait a second, one second, trying to catch up with you. The light skinned guy, |

4

| 1 | | how about a height and weight for him, Mr. Savage. |
|---|---|---|
| 2 | Savage: | Well, they were sitting down at the time. But you know, noticing through the |
| 3 | | window, he looked like he was about my height and about my weight. |
| 4 | Medeiros: | And you are about how big, Sir? |
| 5 | Savage: | I'm about, I'm almost six foot and I'm two thirty four. |
| 6 | Medeiros: | So he was about six foot, two thirty |
| 7 | Savage: | About six foot, probably two thirty give a little, take a little |
| 8 | Medeiros: | Did he have any facial hair on him? Mustache |
| 9 | Savage: | No, I couldn't see no hair on him. |
| 10 | Medeiros: | Okay. Did he talk to you, did he say anything? |
| 11 | Savage: | He didn't say nothing, the one that was dark said something, what happened was |
| 12 | | the guy, the dark guy looked at me, but then the light skinned guy, he (inaudible) |
| 13 | | turned so I was trying to really get a look because I was trying to really look at |
| 14 | | him. I was standing with about from where |
| 15 | Medeiros: | (Inaudible) |
| 16 | Savage: | Yeah. |
| 17 | Medeiros: | (Inaudible) |
| 18 | Savage: | I would be trying to look at him and when he (inaudible) I saw a side of his head, I |
| 19 | | looked at him and I said I thought maybe it may have been the downstairs |
| 20 | | neighbors but then I said, no, these are not none of them. So he turned and looked |
| 21 | | at me and I got a good look at him and the dark skinned guy looked at me straight |
| 22 | | in the face. |

5

| 1 | Medeiros: | Okay, we'll start, let's do with him. Male, uh, black also. |
| 2 | Savage: | Male black |
| 3 | Medeiros: | About how old Sir? |
| 4 | Savage: | About twenty five. |
| 5 | Medeiros | Okay, same size as the other guy and you or |
| 6 | Savage: | Probably about the same size but he was a lot smaller in build. |
| 7 | Medeiros: | Okay. Would you describe his build as thin |
| 8 | Savage: | Thin |
| 9 | Medeiros: | Okay. Six foot, thin build |
| 10 | Savage: | Yeah about six foot thin build. |
| 11 | Medeiros: | What type of hair did he have the dark skinned guy? |
| 12 | Savage: | He had, uh, let's see, he had his hair was longer than mine so it's probably a half |
| 13 | | an inch, my hairs (inaudible) |
| 14 | Medeiros: | a natural hair like yours? |
| 15 | Savage: | Yeah |
| 16 | Medeiros: | hair that's natural. Any facial hair on him? |
| 17 | Savage: | Yeah, it's a little thin mustache, bubble eyes like I got. |
| 18 | Medeiros: | Okay and you said he was dark skinned, right sir? |
| 19 | Savage: | Yeah, black. |
| 20 | Medeiros: | And, how about his clothing Sir? |
| 21 | Savage: | He had on a leather coat, too. |
| 22 | Medeiros: | Black leather coat? |

6

| 1 | Savage: | Yes. |
|---|---|---|
| 2 | Medeiros: | Do you remember what color pants? |
| 3 | Savage: | No, I didn't see his pants. |
| 4 | Medeiros: | Anybody else out there with them? |
| 5 | Savage: | No, it was just them two. |
| 6 | Medeiros: | Okay. So, they are standing right here on the Hilton side. |
| 7 | Savage: | They're sitting right out here for about at least thirty minutes because what I did is |
| 8 | | I thought they was trying to you know (Inaudible, covered by Medeiros) |
| 9 | Medeiros: | (Inaudible) |
| 10 | Savage: | (inaudible) one of the cars so I did, just I thought, I'd scare them, I hold my |
| 11 | | kitchen window and slammed it and then I went back to the window and they |
| 12 | | wouldn't budge, so I said okay, maybe they're up to something so I try to hear |
| 13 | | what they're saying, so I decided I'd put my pants on and stuff. I went down there |
| 14 | | in my slippers and I just looked at them it was kind of let them know I know |
| 15 | | you're out here so I hope you all not trying, you know, |
| 16 | Medeiros | right |
| 17 | Savage: | do anything wrong so as soon as I jammed them up that's when the guys, when I |
| 18 | | turned and went back upstairs they immediately jumped in the Cadillac and I |
| 19 | | know it was a Cadillac, they was riding in a Cadillac, they was, they just didn't go |
| 20 | | past by (inaudible) of the Cadillac |
| 21 | Medeiros: | Okay, now they are right out here, both of them, where did you first see the |
| 22 | | Cadillac |

7

| | | |
|---|---|---|
| 1 | Savage: | The Cadillac was right here in front of the white car |
| 2 | Medeiros: | Okay, you are pointing right outside, |
| 3 | Savage: | Right out here in front of |
| 4 | Medeiros: | In front of Hilton |
| 5 | Savage: | Right where the white car where the police car is right there |
| 6 | Medeiros: | Was it facing Bancroft or the other way? |
| 7 | Savage: | It was facing towards Bancroft |
| 8 | Medeiros: | Okay and you described it as an 81 |
| 9 | Savage: | 81, 82 or 83 Coupe De Ville with a black top, half black top with black interior |
| 10 | Medeiros: | Okay, was there anybody else in that car? |
| 11 | Savage: | Only two |
| 12 | Medeiros: | Okay. Was the engine running when they were out there do you know? |
| 13 | Savage: | No, the engine wasn't running at all, the car was parked. |
| 14 | Medeiros: | Which one, could you see which one hit the drivers seat when they left. |
| 15 | Savage: | No, uh, you know what? Matter of fact, I believe the dark skinned guy, because |
| 16 | | when I looked through the window down, we were looking, I didn't have a |
| 17 | | (Inaudible) but I kind of had the window cracked (inaudible) window, I uh, |
| 18 | | peeked through, I could see the white so I believe the dark skinned guy was |
| 19 | | driving. |
| 20 | Medeiros: | Okay, but could you tell, did you see them both get into the car? |
| 21 | Savage: | I saw them both get into the car. |
| 22 | Medeiros: | Okay and when you got to Bancroft here, could you tell which way they took off? |

8

| 1 | Savage: | No, I, because there's a tree right there and like I wasn't really, I could see the |
| 2 | | back of, (inaudible) stayed there for about two or three minutes and then after that |
| 3 | | when they pulled off I didn't pay no attention. |
| 4 | Medeiros: | And then there was, about a half hour later you heard the, you thought it was a |
| 5 | | knocking on a bar? |
| 6 | Savage: | Well, after I heard the knocking on the, I really didn't even go to, after I heard it, |
| 7 | | I turned, I had my remote, I turned the tv on mute and I just laid there. And I said, |
| 8 | | oh, well you know, maybe somebody was knocking on the door and then I could |
| 9 | | hear somebody hollering. So after that, I decided to go to the window when I |
| 10 | | pulled the blind, you know, I didn't turn the light on, I just pulled the blind, I was |
| 11 | | looking out the window, I saw the guy, light skinned, I didn't know it was him |
| 12 | | yet, but I was looking and he was standing over the car and he was still talking. |
| 13 | Medeiros: | Was he standing over the car that the victim was in? |
| 14 | Savage: | Right |
| 15 | Medeiros: | That was a white car, do you know what type it was? |
| 16 | Savage: | It looked like it could have been a white or a cream, light colored wall, I know it |
| 17 | | had to be a Continental, I believe, but I kept looking and I saw and, after I |
| 18 | | couldn't see him talking to nobody. |
| 19 | Medeiros: | And that was the white skinned guy |
| 20 | Savage: | Yeah |
| 21 | Medeiros: | Was he on the passenger side |
| 22 | Savage: | He was on the passenger side, standing at the door and the door was open. And he |

9

1       was standing there and he was just talking. Matter of fact, he was standing, he

2       had his arm up on the door and I was looking at him and I was trying, I don't see

3       nobody but after that I could hear another guy walking because you know my

4       bathroom window was open, I could hear the other guy just hollering, come on,

5       man would you please, get, let's get the fuck, come on, let's go. And the other

6       guy, he turned, I thought that he was looking up at me but the lights off, you could

7       see you know, my tv blaring and he didn't even rev man, he took (inaudible) and

8       he just walked (inaudible)

9   Medeiros:   The light skinned guy and the guys he was walking with

10  Savage:     The guy was walking like it wasn't nothing, he was just walking. The other guy,

11              he was ready to go, he, you could hear him running back to the car and by the time

12              you could count to like twenty, you could hear the car start up and then burn off

13              and then just drove off.

14  Medeiros:   Did you see anybody, when the light skinned guy is on the passenger side of the,

15              Uh, Continental, anybody else out there?

16  Savage:     I didn't see nobody.

17  Medeiros:   Any other cars pulled away?

18  Savage:     I didn't see no other cars?

19  Medeiros:   Okay, do you remember what the light looks like when you look out there where

20              the car was?

21  Savage:     It, it was dark but it was clear. I could see.

22  Medeiros:   Okay. Uh, (inaudible) do you seem pretty sure it was the same two guys

10

| 1 | Savage: | That was the same, (inaudible) a light skinned guy, light skinned with the leather |
| 2 | | jacket on, it was him. I, I, I know it was him. I was looking dead at him because |
| 3 | | after, (inaudible) I said that's the same guy that was on the side of the building. |
| 4 | | That's what I, I said, Oh shi, I wasn't really tripping, I said to myself when I saw |
| 5 | | the Continental, I said maybe they was just breaking into the car or probably they |
| 6 | | was casing or when I was here the little bang bangs, whatever it was, they was |
| 7 | | trying to break the car open but when the door was open and it was sitting there |
| 8 | | after I heard, he was standing there and he was just looking like he was, he was |
| 9 | | saying something, he was saying but he was standing there, he wouldn't move |
| 10 | | until the other guy kept hollering at him to go. |
| 11 | Medeiros: | Did he seem, he was saying something, what did his demeanor look like, standing |
| 12 | | at the, the passenger side. |
| 13 | Savage: | Shh, he was calm. |
| 14 | Medeiros: | He was calm |
| 15 | Savage: | He was calm like he wasn't worried, that's what tripped me out. That's why he |
| 16 | | walked away, he didn't run and then that's when I decided to go out here and see |
| 17 | | what they were up to. |
| 18 | Medeiros: | Okay. (Ringing of phone covers) |
| 19 | Savage: | Yes, you ready? All right I'll be there in a few minutes, bye. |
| 20 | Medeiros: | Where are we now? Uh, your statement says about thirty to forty minutes later I |
| 21 | | heard some arguing |
| 22 | Savage: | Yeah |

11

| 1 | Medeiros: | By the windows. Where did the arguing seem like it was coming from? |
| 2 | Savage: | Right there from the car. |
| 3 | Medeiros: | How many voices did you hear, sir? |
| 4 | Savage: | I could only hear one, you know, because like I said, the tv was on but I could |
| 5 | | hear but I was really paying no attention, and then after I heard a little, little tap |
| 6 | | taps, I could still hear the guy hollering and you know and the next thing I know |
| 7 | | he's still standing there because that's when I decided |
| 8 | Cruz: | (Inaudible) |
| 9 | Savage: | made me look and then I went to the window and I peeked out and I was just |
| 10 | | looking and I just saw the guy stand, I couldn't see who he was talking to because |
| 11 | | I couldn't see nothing, I just saw his arm on the door and he was just standing |
| 12 | | there, then when I heard the other guy, when I heard the other guy hollering man, |
| 13 | | come on, come on, then I said, oh oh, something's up and when he started walking |
| 14 | | away really slowly, I looked down at the front window and I said, that's the dark |
| 15 | | guy and then I looked and I said, I'll be damned them the two guys on the side of |
| 16 | | the building. |
| 17 | Medeiros: | Have you ever seen them around before? |
| 18 | Savage: | You know how you've just seen a face before? |
| 19 | Medeiros: | Uh-huh |
| 20 | Savage: | I've seen the light skinned guy face before, I just can't place where I seen him at. |
| 21 | Medeiros: | How, when you are out there talking to them, you were within six to seven feet of |
| 22 | | them |

| | | |
|---|---|---|
| 1 | Savage: | Okay, when you guys just looked up when I saw you looking up |
| 2 | Medeiros: | Uh-huh |
| 3 | Savage: | I was at the back tail of the red truck |
| 4 | Medeiros: | Okay |
| 5 | Savage: | Right there, where you can sit right there, they were sitting there and that's how |
| 6 | | close I was to them |
| 7 | Medeiros: | Uh, could you identify these two if you saw them again. |
| 8 | Savage: | I probably could if I saw them. |
| 9 | Medeiros: | And, just to clarify, the person who was in the car, the white car, what seat was |
| 10 | | the victim, what seat was he in? |
| 11 | Savage: | The victim that's dead now? |
| 12 | Medeiros: | Yes Sir |
| 13 | Savage: | He was laying on the passenger side on his stomach. |
| 14 | Medeiros: | Okay |
| 15 | Savage: | He had on a red shirt and red shoes, I was looking. |
| 16 | Medeiros: | Anybody else in the car with the passenger |
| 17 | Savage: | I didn't see anybody |
| 18 | Medeiros: | Sergeant Cruz |
| 19 | Cruz: | Yes. Sir, when you went out there first time, you saw (inaudible) and they told |
| 20 | | you they were just out there doing something, were they drinking that night? |
| 21 | Savage: | Uh, I don't know if they was drinking, but I know I seen them already flicking a |
| 22 | | light, you know, they was smoking, it could have been a joint or a cigarette but |

13

| | | |
|---|---|---|
| 1 | | they was sitting there. The guy said that, oh we're just sitting here drinking, but |
| 2 | | you know, then, when I backed up, then they asked me for a light and I'm saying |
| 3 | | (inaudible) you think I'm stupid, you know they already was lighting whatever it |
| 4 | | was they was lighting up there so that's when I backed up off of them. Cause I |
| 5 | | said no, I'm not going to get too close up on them. |
| 6 | Cruz: | Which window were you looking out of when you uh, after you heard the bang |
| 7 | | bang |
| 8 | Savage: | My bedroom window |
| 9 | Cruz: | Okay, did you hear the argument, argument before you heard the bang bang? |
| 10 | Savage: | I heard the argument, well, obviously my tv was going they was probably, |
| 11 | | probably arguing. But I didn't really start concentrating on it until after the bang |
| 12 | | bang and then I decided to turn my tv with the remote, then I could still hear the |
| 13 | | guy hollering. |
| 14 | Cruz: | I think, at one point, you said you heard somebody screaming. |
| 15 | Savage: | That one was hollering, I don't know, I think he might have been the guy that was |
| 16 | | standing over the door. It was like he was still hollering at him like you know |
| 17 | | whatever he was shouting for, whatever it was. But I guess he was still hollering, |
| 18 | | like I said I didn't see what happened as far as the shooting. I, I should have |
| 19 | | jumped up there the first time I, I usually do but I didn't. Because they didn't |
| 20 | | sound like gunshots when I first heard it. |
| 21 | Cruz: | Did you hear any women's voices out there? |
| 22 | Savage: | No, I didn't hear no woman that I know of. If there was a woman she must have |

14

1       broke and ran during the time that when I decided to get up and look out the

2       window. Why did (inaudible) say she seen it too?

3   Cruz:       Uh, we don't discuss (inaudible)

4   Savage:     Well,

5   Medeiros:   No, it's okay, I appreciate your curiosity.

6   Cruz:       I don't have any other questions.

7   Medeiros:   How many, you said it was like knocking on the bar

8   Savage:     Something like maybe, three four

9   Medeiros:   three or four

10  Savage:     five maybe because anywhere from three to five.

11  Medeiros:   Okay, sir, uh, anything else you think we should know, Mr. Savage?

12  Savage:     That's about it.

13  Medeiros:   Okay. I totally appreciate your cooperation. Everything you said told us the truth

14          sir?

15  Savage:     Yeah, I was the one that called.

16  Medeiros:   Okay, with that I'm going to shut the tape off. I have five o four a.m. Zero five

17          oh four hours.

18

19  END OF TAPE

20

21

22

15

# EXHIBIT COVER PAGE

C

EXHIBIT

Description of this Exhibit: DEFENSE INVESTIGATION REPORT

Number of pages to this Exhibit: ___6___ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

*Linda L. Bruzzone*

*Private Investigator*

*State License No. PI 14644*

143 Esmeralda Court
Vacaville, California 95687
Phone 707-451-7655
lbruzzone@earthlink.net

*August 14, 2000*

*Gary L. Sherrer*
*Attorney at Law*
*2100 Embarcadero*
*Oakland, California*

*Re: People vs. Lockhart*

*Dear Mr. Sherrer:*

*On August 10, 2000, Enzor Savage was interviewed at his residence, the address of which is reflected upon the police report in the above entitled matter. He was advised we were private investigators and were looking into the matter for you, the attorney of Lockhart. He agreed to speak to us, however made it quite clear that he had no intent of changing his statement, that it stood. He was told we weren't interested in any change of statement, we were interested in obtaining clarification and more detail of what he observed and desired a truthful statement.*

*Mr. Savage invited us into his living room and advised the following:*

*On the date in question, he was in bed, in his bedroom, across the street from the crime scene. His windows were open as it was a warm evening. He heard noises from down below, next to the side of the house. There was a banging sound like the sound of a bar door closing. He slammed the window closed in order to encourage them to leave.*

*He went to the left right window of his home and again looked out onto the individuals. He thought one looked like his friend, Jacob, which he thought to be unusual as Jacob wasn't ordinarily out that early. He looked closer*

1

*and determined it wasn't Jacob.*

*Concerned, he went outside, exiting the front stairs. He approached where the two men were standing, approximately ten feet from him. Parked in front of his house at 5516 Hilton was a blue Cadillac. He stated he walked by the blue Cadillac and looked inside of it, observing the arm rest. He approached closer to the individuals. He asked them, "What's up?" He stated one of the individuals stated, "We're doing something, do you have a match?" He found that to be unusual as he noted the individual had previously lit something. He backed up and away from them and went back into the house, fearing for his own personal safety.*

*He stated he then went back to bed and laid down. Shortly thereafter, he again arose and went to the window. He observed the two men leave in the blue Cadillac. The light skinned man with white pants sat in the passenger side while the other individual drove off. He stated both individuals were dressed in black. He was unwilling to provide identifying information regarding the other individual who was the driver with the exception of stating it was Eric Lockhart. (See more of the Lockhart identification below.)*

*He returned to bed and shortly thereafter heard arguing outside, coming from Bancroft Street. Very shortly after hearing the voices, he heard a quick repetitive sound of shots. (bang, bang, bang, bang) He arose and looked out his window. In front of 5555 Bancroft, he saw an individual standing by the passenger door of a Lincoln Continental. The person had his hand on the car door and was leaning toward the door. He stated the individual stood there for minutes. He thought perhaps this individual was breaking into a car. This person was wearing white pants, a black jacket and was a light skinned black man.*

*He ran into his bathroom and looked out his bathroom window. He saw the same blue Cadillac that was previously parked in front of his home parked in the parking lot of the business next to the apartment building located at 5555 Bancroft Avenue . He stated he observed the other individual he had previously seen in front of his home, standing by the corner and was yelling at the subject standing by the Cadillac. He saw this person then begin running from the Cadillac and down the block toward the vehicle, stopping half way, continuing to yell. The individual standing by the Continental still didn't leave, continuing to stand and look into the vehicle. He then slowly and methodically walked away from the car toward the Cadillac and the person standing halfway between the Cadillac parked in the parking lot next to the apartment building. He heard the man who walked from the Cadillac state, "Come on, let's get the (expletive) out of here." He stated the two then proceeded toward the Cadillac. He did not see them get into the*

2

*driver's seat, however stated he heard the Cadillac start up, recognizing it as the same vehicle previously. He saw the Cadillac leave but did not see in which direction the vehicle traveled.*

*After viewing this, he stated he called 911 and went down onto the street to see what occurred. He noted the right passenger door was open. He walked over to it. He stated he told the 911 dispatcher that the doors of the vehicle were open and maybe they should get somebody to come out. He noted the back window, on the drivers side was shattered. He saw an individual in the front seat laying face down.*

*Savage stated he relayed the information to dispatch and then met with investigators. He stated he was reluctant to testify and cooperate with investigators because he was treated poorly by police when he witnessed a homicide in front of his home several years prior. As a result, in this current matter, he stated he told police he didn't wish to attend a physical lineup and the police called begging him to attend. He stated he was angry with the investigators in this matter as they wouldn't give him information he requested regarding the matter. He stated the police officers advised him they couldn't tell him. He asked details from us regarding the matter and we advised we couldn't tell him either, as we didn't wish to bias the investigation.*

*When asked to attend the second live lineup, he stated he watched the individuals as they entered the room. One individual appeared familiar to him, though he could not remember what number in the lineup the individual was. He stated, at that time, he recognized the person to be Eric Lockhart. He advised while watching the lineup, he uttered, "Fuck, fuck." He stated he was angry and decided not to formally identify him at that time. He said he simply decided to go home and not say anything.*

*Savage stated he had known Lockhart and his brother, Michael, for many years previous to the date of the lineup. He dated this back to approximately twenty years previously. He said he would go to the Lockhart home and Eric was young at that time. He stated he knew them both.*

*Savage was asked if the individual who was outside his home was Lockhart. He declined to answer. He was asked if the individual who was standing at the driver's door of the vehicle was Lockhart. He stated it was not. He advised Lockhart was the driver of the Cadillac and was the individual who was standing in the parking lot where the Cadillac was parked and that Lockhart was the individual who began to approach the man standing by the Continental. He stated he saw Lockhart drive the car away, though did not know in what direction the vehicle went.*

3

*Mr. Savage was asked if he recalled stating the second individual was bald. He did not recall this, though stated "bald" meant that there could have been very short hair upon the head. He also stated people can change their hairstyles in prison.*

*Mr. Savage was shown a photograph and asked if the individual in the photograph was familiar to him in any way. He looked at it for a brief period of time, then sat back, stating he wasn't going to make any comment. He stated he would recognize and identify the second individual when he saw him in court.*

*He was asked a description of Mr. Lockhart. He declined to provide a description, again stating he would identify the individual in court.*

*He was read the supplemental report by Detective Medeiros. He stated he did call Medeiros, though doesn't recall the text entered by Detective Medeiros. He stated after going to the lineup, seeing Lockhart and then receiving a telephone call from friends, he was angry Lockhart could have done something like that, that murder wasn't justified. He declined to provide any other information regarding the lineup or any other definitive information about Lockhart or his identity.*

*Mr. Savage was concerned his comments may be "twisted" in some manner by defense investigators. He seemed somewhat apologetic regarding his refusal to give a statement, stating he many get "amnesia" in court when asked questions regarding our conversation this date.*

*Sincerely,*

Linda L. Bruzzone

4

*Attempts were made to find Allbright. Nobody was at his residence in Campbell Village. Street people were consulted. He hasn't been seen lately. We were told he was in the 80s slinging heroin. 81st and B. We were also told to check 24th and West.*

*We went to those areas three times on the 10th as well as back to Campbell Village twice, he was not at home.*

*A neighborhood canvas was conducted. No direct information obtained. Hearsay, child heard gunshots, heard man say, "Why did you do that, why did you do that? " Then heard, "Sweet, Jesus," "Sweet, Jesus." (probably from the victim) No eyewitnesses.*

*Interviewed Savage above. Stayed late to review crime scene at night. Area is brightly lit. Savage has a panoramic, clear view from his rear, not good. As well, the front of Savage's house offers clear view to front of vics house, he claims they were laying in wait, sure that is DA's premise.*

No on was home @ Irene's house either. She promised to call back. They left w/ her friend. She is the former girlfriend of Allbright.

Gary, call when you get this stuff.

5



1) Where Savage states car was
are they were sitting when first
saw. They had a clear view of where
Vic car would be. D.A. will be working
working on a theory of "laying in wait"

2) Where Savage states he sees car again
after shooting takes place. This is about
1/2 blk from (V) Car.

3) Vic's Car. No to scale. There is room for
three cars to park behind it until
driveway to apt parking lot.

# EXHIBIT COVER PAGE

D

EXHIBIT

Description of this Exhibit: OFFICER THURSTON REPORT

Number of pages to this Exhibit: __8__ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

# CRIME REPORT

**OAKLAND POLICE DEPARTMENT**
455 – 7th Street
Oakland, CA 94607-3985

Assign To: Homi / Medeiros

RD No. 00 44120

| ROUTING | | |
|---|---|---|
| CID | | |
| YSD | | |
| VICE | | |
| CSD | | |
| TRAFFIC | | |
| D.A. VICT/WIT | | |
| MISC | | |

Outside Reporting Agency | Case No. | Police Beat 27 | CP Beat 27 | Incident No. 70

**VICTIM** LAST, First, Middle: BROWN  GERALD  DEWAYNE
Business Name | Local/State/Federal
Sex M | Race B | DOB 14 OCT 52 | Age 43

Home Address: 5555 BANCROFT AVE #B | City: Oakland | Zip 94605 | Home/Msg. Phone ( )

Business Address / School | City: Oakland | Zip | Work Phone ( )

Occupation | D.L. No. | State
Working Hours

☐ Domestic Violence  ☐ Victim Injured  ☐ Sex Assault Victim Request Conf.
☐ Victim's Support  ☐ Resource Info Provided

**ADDITIONAL PERSON** LAST, First, Middle: SAVAGE  ENZOR
Sex M | Race B | DOB 29 JUL 51 | Age 45

Home Address: 5515 HILTON #C | City: Oakland | Zip 94605 | Home/Msg. Phone (510) 535 2334

Business Address / School: 2900 ATLAS RD. | City: Oakland | Zip | Work Phone (510) 248 2516

| LOCATION | POINT OF ENTRY | LOCATION P.O.E. | METHOD OF THEFT | BREAK GLASS | BURGLARY | WEAPON USED |
|---|---|---|---|---|---|---|
| ☐ BANK/ATM | ☐ DOOR | | ☐ OPEN/UNLOCKED | ☐ REMOVE DOOR | ☐ AUTO | ☒ FIREARM |
| ☐ CONV MKT | ☐ WINDOW | ☐ FRONT | ☐ FORCED SCREEN | ☐ REMOVE WINDOW | ☐ RESIDENCE | ☐ CUT/STAB INSTR |
| ☐ GAS STATION | ☐ GARAGE | ☐ REAR | ☐ CUTTING DEVICE | ☐ POSS EMPLOYEE | ☐ COMMERCIAL | ☐ HANDS, FEET, FIST |
| ☐ OTHER COMM | ☐ ADJ PREM | ☐ SIDE | ☐ BODY FORCE | ☐ KEY | ☐ OTHER | ☐ CHEMICAL |
| ☐ RESIDENCE | ☐ VENT/SKYLIGHT | ☐ ROOF | ☐ PRY TOOL | ☐ WATER METER | | ☐ NONE |
| ☒ STREET | ☐ OTHER | ☐ UNK | ☐ CHANNEL LOCKS | ☐ NONE | | ☐ OTHER |
| ☐ MISC | | | ☐ ATTEMPT FORCE | ☐ UNK | ☐ ALARM RESPONSE | |

☐ Gang Related | ☐ Hate Crime Motivated By: | ☐ Race | ☐ Ethnicity | ☐ Religion | ☐ Sexual Orientation | ☐ Physical Disability | ☐ Mental Disability | ☐ Gender

Common Name: MURDER | Section / Subsection: 187 (A) | Code: P.C. | Pertains To: V: 1

Location (Address/Block No./Intersection) ☐ OHA ☐ ABC: IFO 5555 BANCROFT AVE.

Occurred Date 15 MAY00 | Time 0049 | Day MON

**VANDALISM**
☐ EGGED
☐ BREAK WINDOW
☐ SHOOT WINDOW
☐ GRAFFITI
☐ MAIL BOX
☐ KEYING/SCRATCHING
☐ SLASH TIRES
☐ OTHER

**LOSS** ☒ NONE

| CHECK ALL THAT APPLY | | | | TYPE OF THEFT | |
|---|---|---|---|---|---|
| 1 ☐ CURRENCY/NOTES | 7 ☐ HOUSEHOLD GOODS | | | ☐ PICKPOCKET | |
| 2 ☐ CLOTHING/FURS | 8 ☐ CONSUMABLE GOODS | | | ☐ PURSESNATCH | |
| 3 ☐ JEWELRY/PREC.METAL | 9 ☐ LIVESTOCK | | | ☐ AUTO ACCESS | |
| 4 ☐ FIREARMS | 10 ☐ MOTOR VEHICLES | | | ☐ AUTO CLOUT | |
| 5 ☐ OFFICE EQUIPMENT | 11 ☐ MISCELLANEOUS | | | ☐ SHOPLIFTING | |
| 6 ☐ TVS. RADIO, STEREO | | | | ☐ BICYCLE | |

15 MAY00 0015 MON

☐ COIN OP. DEVICE
☐ FROM BUILDING
☐ OTHER

**SOLVABILITY FACTORS** (Check All That Apply)
☐ SURVEILLANCE PHOTO  ☐ NAMED SUSPECT
☐ SERIOUS INJURY  ☐ IDENTIFIABLE SUSPECT
☐ EVIDENCE  ☐ R/O REQUESTS INVESTIGATION
☐ SUSPECT IN-CUSTODY

U.C.R. Code ☐ THE VICTIM / REPORTING PARTY contacted the police department to report the THEFT / LOSS / DAMAGE of the listed property. There are no known suspects. This report is made to alert the police. No narrative was completed.

**VICTIM VEHICLE** License No. 2 NCS 804 | State CA
☐ Secured at the Scene  ☐ Towed  Tow No.
☐ Released to the Owner  ☐ Fingerprinted
☐ Hold (Unit)  ☐ Stolen

☒ Car  Yr 89 | Make LINC | Model CON | Body Type 4D | Color CREAM | VIN 1 L N L M 9 8 4 7 K Y 6 7 6 7 1 7
☐ Truck
☐ Other

☐ Stolen  ☐ Mens  ☐ Mtn. | Color | Brand | Model | Speed | License No. | Serial No.
☐ Bicycle  ☐ Womens  ☐ Road

**PROPERTY NARRATIVE** ☐ Loss  ☐ Evidence  ☐ Safekeeping  ☐ Recovered

Location Where Property Held

| Item | Qty | Item Type, Brand, Model No., Size, Color, Marks, etc. | Serial No. | $ Value |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| Total Number of | | | ☐ Photos Taken | Evidence Collected | Tech | Rec Value | Loss Value | Page |
|---|---|---|---|---|---|---|---|---|
| Vict 1 | Wit | Susp | Arr | ☐ Phone Report | On Scene | ☒ Yes ☐ No | ∅ | ∅ | of 6 |
| | | 2 | ∅ | | ☒ Yes ☐ No | Tag Left ☐ Yes ☒ No | | | |

Reported By: D. THURSTON | Serial No. 8262 | Watch 1 | Area III | Supervisor: LT. WILLIAMS | Serial No. | Reviewer: SGT Medeiros | Serial No. 7741C

# O P D — POLICE REPORT

**SUSPECT REPORT**

Oakland Police Department
455 - 7th Street
Oakland, CA 94607

RD # 004120

| CRIME | INCIDENT NO. | | VICTIM LAST, First, Mid. |
|---|---|---|---|
| 187 (A) P.C. | | V1 | BROWN GERALD DEWAYNE |

## SUSPECT

Number: 1  LAST, First, Mid.

RELATIONSHIP TO VICTIM  INCUSTODY THIS OFFENSE [ ] YES [X] NO  CITE #

| SEX | RACE | D.O.B. | AGE | HEIGHT | WEIGHT | HAIR | EYES | DL. NUMBER | PFN |
|---|---|---|---|---|---|---|---|---|---|
| M | B | | 25 | 6'0" | 280 | BALD | | | |

HOME ADDRESS _____  CITY [ ] OAKLAND  ZIP  APT. NO.  HOME/MSG.PHONE ( )

WORK ADDRESS (Name of Business) (School) _____  CITY [ ] OAKLAND  ZIP  OCCUPATION  WORK PHONE ( )

ADMONISHMENT: ADMONISHED [ ] YES [ ] NO  REFUSED [ ] YES [ ] NO  STATEMENT [ ] YES [ ] NO  [ ] PROBATION COUNTY _____ Officer _____

BY: (OFFICER/DATE/TIME:) _____  [ ] PAROLE  AGENT _____ [ ] PAL

DESCRIPTION PROVIDE BY  WJ #7  CLOTHING, SCARS, MARKS, TATOOS, WORDS USED  BLK JACKET  WHI PANTS

| HAIR LENGTH | HAIR STYLE | FACIAL HAIR | COMPLEXION | APPEARANCE | SPEECH | DEMEANOR |
|---|---|---|---|---|---|---|
| [ ] SHORT | [ ] NATURAL / AFRO | [X] NONE | [X] LIGHT (YELLOW) | [X] CASUAL | [ ] LOW PITCH | [X] CALM |
| [ ] MED. (HALF EAR) | [ ] BRAIDED | [ ] BEARD | [ ] MEDIUM | [ ] WELL GROOMED | [ ] HIGH PITCH | [ ] POLITE |
| [ ] LONG (COVER EAR) | [ ] CREWCUT | [ ] MUSTACHE | [ ] DARK | [ ] UNKEMPT | [ ] SLURRED | [ ] APOLOGETIC |
| [ ] COLLAR | [ ] CURLY | [ ] BEARD & MUSTACHE | [ ] FRECKLED | [ ] RIGHT HANDED | [ ] STUTTER | [ ] NERVOUS |
| [ ] SHOULDER | [ ] PONYTAIL | [ ] GOATEE | [ ] ACNE | [ ] LEFT HANDED | [ ] ACCENT | [ ] PROFESSIONAL |
| [X] BALD/SHAVED | [ ] PUNK | [ ] SIDEBURNS | [ ] POCKMARK | [ ] BIRTHMARK | TYPE _____ | [ ] OFFENSIVE |
| [ ] RECEDING | [ ] CONSERVATIVE | | [ ] BUDDY | [ ] MOLE | [ ] OTHER _____ | [ ] HOSTILE |
| | | | | | | [ ] VIOLENT |

OTHER DISTINCTIVE FEATURES  [ ] BODY ODOR TYPE _____  WEAPON USED  [ ] REVOLVER  [X] SEMI-AUTO PISTOL  [ ] SHOTGUN  [ ] RIFLE
[ ] GOLD TOOTH  [ ] MISSING TEETH  [ ] LARGE EYES  CAL. 380  BARREL _____  [ ] SAWED OFF  [ ] NICKEL  [ ] BLUED
[ ] SILVER TOOTH  [ ] GLASSES  [ ] MISSING LIMBS  [ ] BLUDGEON / CLUB  [ ] HANDS / FEET  [ ] ROCK / BRICK  [ ] CUT / STAB  [ ] VEHICLE

## SUSPECT

Number: 2  LAST, First, Mid.

RELATIONSHIP TO VICTIM  INCUSTODY THIS OFFENSE [ ] YES [ ] NO  CITE #

| SEX | RACE | D.O.B. | AGE | HEIGHT | WEIGHT | HAIR | EYES | DL. NUMBER | PFN |
|---|---|---|---|---|---|---|---|---|---|
| M | B | | 25 | 6'0" | 175 | BLK | | | |

HOME ADDRESS _____  CITY [ ] OAKLAND  ZIP  APT. NO.  HOME/MSG. PHONE ( )

WORK ADDRESS (Name of Business) (School) _____  CITY [ ] OAKLAND  ZIP  OCCUPATION  WORK PHONE ( )

ADMONISHMENT: ADMONISHED [ ] YES [ ] NO  REFUSED [ ] YES [ ] NO  STATEMENT [ ] YES [ ] NO  [ ] PROBATION COUNTY _____ Officer _____

BY: (OFFICER/DATE/TIME) _____  [ ] PAROLE  AGENT _____ [ ] PAL

DESCRIPTION PROVIDE BY  WJ #7  CLOTHING, SCARS, MARKS, TATOOS, WORDS USED  BLK JACKET

| HAIR LENGTH | HAIR STYLE | FACIAL HAIR | COMPLEXION | APPEARANCE | SPEECH | DEMEANOR |
|---|---|---|---|---|---|---|
| [X] SHORT | [X] NATURAL / AFRO | [ ] NONE | [ ] LIGHT | [X] CASUAL | [ ] LOW PITCH | [X] CALM |
| [ ] MED. (HALF EAR) | [ ] BRAIDED | [ ] BEARD | [ ] MEDIUM | [ ] WELL GROOMED | [ ] HIGH PITCH | [ ] POLITE |
| [ ] LONG (COVER EAR) | [ ] CREWCUT | [X] MUSTACHE | [X] DARK | [ ] UNKEMPT | [ ] SLURRED | [ ] APOLOGETIC |
| [ ] COLLAR | [ ] CURLY | [ ] BEARD & MUSTACHE | [ ] FRECKLED | [ ] RIGHT HANDED | [ ] STUTTER | [ ] NERVOUS |
| [ ] SHOULDER | [ ] PONYTAIL | [ ] GOATEE | [ ] ACNE | [ ] LEFT HANDED | [ ] ACCENT | [ ] PROFESSIONAL |
| [ ] BALD/SHAVED | [ ] PUNK | [ ] SIDEBURNS | [ ] POCKMARK | [ ] BIRTHMARK | TYPE _____ | [ ] OFFENSIVE |
| [ ] RECEDING | [ ] CONSERVATIVE | | [ ] BUDDY | [ ] MOLE | [ ] OTHER _____ | [ ] HOSTILE |

OTHER DISTINCTIVE FEATURES  [ ] BODY ODOR TYPE _____  WEAPON USED  [ ] REVOLVER  [ ] SEMI-AUTO PISTOL  [ ] SHOTGUN  [ ] RIFLE
[ ] GOLD TOOTH  [ ] MISSING TEETH  [X] LARGE EYES  CAL. _____  BARREL _____  [ ] SAWED OFF  [ ] NICKEL  [ ] BLUED
[ ] SILVER TOOTH  [ ] GLASSES  [ ] MISSING LIMBS  [ ] BLUDGEON / CLUB  [ ] HANDS / FEET  [ ] ROCK / BRICK  [ ] CUT / STAB  [ ] VEHICLE

## SUSPECT VEHICLE

VEHICLE WAS  [ ] TOW (# ) _____  [ ] SECURED AT SCENE  [ ] FINGERPRINTED  [ ] RELEASED TO OWNER  [ ] HOLD(UNIT) _____

DAMAGE DETAILS, UNIQUE FEATURES  OTHER DESCRIPTION

OWNER _____

ADDRESS _____  CITY [ ] OAKLAND  ZIP  PHONE

| LIC./STATE/OR PLATE COLORS | YEAR | MAKE | MODEL | STYLE | EXTERIOR COLOR | CONDITION | INTERIOR COLOR | INTERIOR |
|---|---|---|---|---|---|---|---|---|
| | 81-82 | CADI | COUPE | 2D | LT BLU / SIL | [X] CLEAN [ ] NEW / [ ] DIRTY [ ] POOR | | [ ] CLEAN [ ] ODOR / [ ] DIRTY [ ] |

| TIRES | RIMS | LEVEL | ROOF | WINDOWS | SEATS | TRANSMISSION |
|---|---|---|---|---|---|---|
| [X] STOCK [ ] WIDE / [ ] SMALL [ ] | [X] STOCK [ ] CHROME / [ ] MAGS [ ] SPOKE | [X] STOCK [ ] LOWERED / [ ] RAISED [ ] | [X] VINYL [ ] LANDAU / [ ] CONV | [ ] TINTED / [ ] BROKEN | [ ] VINYL [ ] BENCH / [ ] CLOTH [ ] BUCKET | [ ] AUTOMATIC / [ ] MANUAL |

| REPORTED BY | SERIAL # | WATCH | DISTRICT | SUPERVISOR | SERIAL # | |
|---|---|---|---|---|---|---|
| D. THURSTON | 8262P | I | IV | LT. WILLIAMS | | PAGE 2 OF 6 |

536-934 (1/97)  ORI 00109

**A**DDITIONAL **I**NFORMATION **REPORT**

OAKLAND POLICE DEPARTMENT
455 - 7th Street
Oakland, CA 94607

RD # 004/41/20

| CRIME /187 P.C. | [ ] SUPPLEMENTAL | INCIDENT # 70 | V1 | VICTIM LAST, First, Mid. Brown, GERALD | |
|---|---|---|---|---|---|
| SUSPECT LAST, First, Mid. UNK | | INCIDENT LOCATION IFO 5555 BANCROFT AVE | | DATE OF THIS REPORT 15 MAY 00 | ORIGINAL DATE REPORTED |

| ITEM # | QNTY. | ITEM TYPE/BRAND | SERIAL # | VALUE |
|---|---|---|---|---|

SUMMARY:  ON  15 MAY 00, AT  ABOUT  0040 Hrs,  I  WAS  WORKING  AS O.P.D  PATROL  UNIT  1L27, WEARING  A  FULL  POLICE  UNIFORM  AND DRIVING  MARKED  PATROL  CAR # 172B.  RADIO  DISPATCHED  ME  TO 5555  BANCROFT  AVE  TO  INVESTIGATE  A  REPORT  OF  A  SHOOTING. UPON  MY  ARRIVAL  I  MET  WITH  WIT/ ONEAL, LATACHA, WHO DIRECTED  ME  TO  A  MAN  LYING  INSIDE  OF  A  VEHICLE (LIC  PLATE # 2NCS804) IFO  5555  BANCROFT  AVE  PARKED  ON  THE SOUTH CURB  FACING. EAST.

I  SAW  THAT  THE  MAN (LATER  ID'ED  AS  V#1/ BROWN, GERALD) WAS LYING  IN  THE  RIGHT  FRONT  PASSENGER  SIDE  OF  A  VEHICLE  FACE DOWN.  HE  WAS  DRESSED  IN  A  RED  SHIRT,  BLACK  SLACKS,  AND  RED SHOES.  HIS  LEGS  WERE  POINTING  EAST AND HIS  HEAD  WAS  POINTING WEST.  HIS  ARMS  WERE  STRAIGHT  ALONG  HIS  BODY.  I  NOTICED  THAT BROWN  HAD  FIVE  APPARENT  GUN  SHOT  WOUNDS, THREE  IN  THE  CHEST AND TWO  IN  HIS  LEFT.. FORE ARM.  THERE  WAS  A  PUDDLE  OF  BLOOD  GATHER- ING  ALONG  BOTH  SIDES  OF  HIS  BODY.  BROWN  WAS  NOT  RESPONSIVE  AND HAD  NO  VITAL  SIGNS.  I  ADMINISTERED  CPR  UNTIL  MEDICAL  UNITS ARRIVED.

AMR  RIG # 501  RESPONDED  TO  THE  SCENE.  THEY  WERE  JOINED  BY O.F.D  TRUCK  # 2558.  BROWN  WAS  TRANSPORTED  TO  ACH  WERE HE  WAS  PRONOUNCED  DEAD  AT  0116,  15 MAYOO.  OFC  M. BATTLE RESPONDED  TO  ACH  AND  ASSISTED  AMR RIG # 501. (SEE  OFC  M. BATTLE # 5189 P  SUPP  FOR  FURTHER  DETAILS).

OFC  N. CERECEDES, # 8275 P,  SPOKE  TO  ONEAL.  ONEAL  SAID  THAT  SHE  WAS INSIDE  HER  HOUSE  LOCATED  AT  5601  HILTON  ST.  WHEN  SHE  HEARD  SOME ONE ARGUING  OUTSIDE.  ONEAL  SAID  IT  SOUNDED  LIKE  TWO  MEN  ARGUING

| REPORTED BY D. THURSTON | SERIAL # B262P | WATCH 1 | DISTRICT 5 | SUPERVISOR LT. WILLIAMS | SERIAL # | PAGE 3 OF 8 |
|---|---|---|---|---|---|---|

538-937 (1/97)

ORI 00109

ADDITIONAL INFORMATION REPORT

**OAKLAND POLICE DEPARTMENT**
455 - 7th Street
Oakland, CA 94607

RD # 00774120

| CRIME | [ ] SUPPLEMENTAL | INCIDENT # | V1 | VICTIM LAST, First, Mid. |
|---|---|---|---|---|
| 187 P.C. | | To | | BROWN, GERALD |

| SUSPECT LAST, First, Mid. | INCIDENT LOCATION | DATE OF THIS REPORT | ORIGINAL DATE REPORTED |
|---|---|---|---|
| UNK | IFO 5555 BANCROFT AVE | 15 MAY OD | |

| ITEM # | QNTY. | ITEM NAME BRAND MODEL # SIZE COLOR MARKING ETC | SERIAL # | VALUE |
|---|---|---|---|---|

SUMMARY CONT: HOWEVER, SHE COULD NOT MAKE OUT WHAT THE DISAGREE-MENT WAS ABOUT. ONEAL SAID APPROX 30-40 SECONDS LATER SHE HEARD A SCREAM FROM OUTSIDE WHICH SOUNDED LIKE A WOMAN'S SCREAM, IMMEDIATELY AFTER THE SCREAM ONEAL HEARD APPROX SIX GUN SHOTS ONE RIGHT AFTER ANOTHER AND THEN SHE HEARD A CAR SPEED AWAY IN AN UNKNOWN DIRECTION. ONEAL SAID SHE WENT OUTSIDE TO CHECK ON HER NEIGHBOR'S VEHICLE WHICH WAS PARKED IFO 5555 BANCROFT AVE AND SAW A MAN'S FOOT HANGING FROM OUTSIDE OF THE RIGHT FRONT PASSENGER SIDE. ONEAL SAID SHE RAN BACK INSIDE OF 5601 HILTON ST. AND CALLED O.P.D.  OFC N. CEREFEDES #8375 P TOOK A WRITTEN STATEMENT.


OFC. R. WORD 8312 P RESPONDED TO 5515 HILTON ST. #C AND SPOKE TO WIT #2 / SAVAGE, ENZOR. SAVAGE SAID HE SAW TWO M-B SITTING ON THE CORNER OF HIS APARTMENT COMPLEX. SUSP #1 DESCRIBED AS A M-B, 25 YRS, 6'0, 230LBS, BALD HAIR, LIGHT COMPLEXION, WEARING A BLACK JACKET, AND WHITE PANTS. SUSP #2 M-B, 25 YRS, 6'0, 175LBS, DARK COMPLEXION WEARING A LEATHER COAT, UNK PANTS. SAVAGE SAID HE SAW THE TWO SUSPECTS GET INSIDE OF AN 81 OR 82 CADILLAC COUPE DEVILLE EITHER LIGHT BLUE OR GRY IN COLOR WITH A BLACK TOP, 2 DOOR. SAVAGE WENT ON TO SAY HE LOOKED OUTSIDE OF HIS BEDroom WINDOW WHICH FACES BANCROFT AVE AND SAW THE CADILLAC DRIVE UP TO THE CORNER OF 55TH AVE. AND BANCROFT AVE. SAVAGE SAID HE HEARD SOME ARGUING ABOUT 30 MIN- 40 MIN LATER AND THEN HEARD SOME LOUD NOISES THAT SOUNDED LIKE SOMEONE HITTING A BAR DOOR. SAVAGE SAID HE LOOKED OUT HIS BEDROOM WINDOW AND SAW SUSP #1 STANDING ON THE SIDEWALK IN FRONT OF 5555 BANCROFT AVE BY A LINE CONT, YELLING INTO THE CAR

| REPORTED BY | SERIAL # | WATCH | DISTRICT | SUPERVISOR | SERIAL # | PAGE |
|---|---|---|---|---|---|---|
| D. THURSTON | 8362P | 1 | 5 | LT. WILLIAMS | | 4 OF 8 |

536-937 (1/97)

# OPD

**OAKLAND POLICE DEPARTMENT**
455 - 7th Street
Oakland, CA 94607

**ADDITIONAL INFORMATION REPORT**

| RD # |
|------|
| 0044120 |

| CRIME 187 P.C | [ ] SUPPLEMENTAL | INCIDENT # 70 | V1 | VICTIM LAST, First, Mid. BROWN, GERALD |
|---|---|---|---|---|
| SUSPECT LAST, First Mid. UNK | | INCIDENT LOCATION IFO 5555 BANCROFT AVE | DATE OF THIS REPORT 15 MAY 00 | ORIGINAL DATE REPORTED |

| ITEM # | QNTY. | PROPERTY... | ... | SERIAL # | VALUE |
|---|---|---|---|---|---|

SUMMARY CONT: ON THE PASSENGER SIDE. SAVAGE SAID HE HEARD SUSP #2 TELL SUSP #1 TO "HURRY UP AND COME ON." SAVAGE SAID HE HEARD WHAT SOUNDED LIKE A CADILLAC TAKE OFF. AND HEAD SOUTH BOUND ON 55TH AVE. SAVAGE SAID HE WALKED OUT OF HIS APARTMENT COMPLEX TO 5555 BANCROFT AVE WHERE THE LINC WAS PARKED AND SAW A M-B IN THE PASSENGER SEAT LYING FACE DOWN NOT MOVING. SAVAGE SAID HE CALLED O.P.D ON HIS CELL PHONE. OFC R. WORD TOOK A WRITTEN STATEMENT FROM SAVAGE, ENZOR.

OFC B. ORTIZ #8132P RESPONDED TO 5532 HILTON ST. AND SPOKE TO BONNER, FRANKIE WHO SAID SHE HAD BEEN SITTING IN HER APARTMENT LOCATED AT 5532 HILTON ST. WHEN SHE HEARD 9-10 GUN SHOTS. BONNER SAID SHE LOOKED OUT HER WINDOW AND SAW A BLU CADILLAC SPEED DOWN THE STREET NORTH BOUND ON BAN-CROFT AVE. BONNER SAID SHE CALLED O.P.D AND WENT OUTSIDE ONCE O.P.D SHOWED UP ON SCENE. OFC B. ORTIZ TOOK A WRITTEN STATEMENT FROM BONNER, FRANKIE.

OFC D. VANTREE #8198P RESPONDED TO 5555 BANCROFT AVE #B AND SPOKE TO BOATLEY, LAKISA WHO SAID BROWN CAME TO 5555. BANCROFT AVE #B AT ABOUT 0030 OR 0045 HRS WOKE HER UP AND ASKED IF SHE WANTED TO GO TO THE VINTAGE INN. BOATLEY SAID SHE TOLD BROWN SHE DID NOT FEEL GOOD AND DID NOT WANT TO LEAVE 5555 BANCROFT AVE. BOATLEY SAID SHE WENT BACK TO SLEEP AND WAS AWAKEN BY O.P.D. OFC D. VANTREE TOOK A WRITTEN STATEMENT FROM BOATLEY, LAKISA.

| REPORTED BY D. THURSTON | SERIAL # 8262P | WATCH 1 | DISTRICT 5 | SUPERVISOR LT. WILLIAMS | SERIAL # | PAGE 5 OF 8 |
|---|---|---|---|---|---|---|

536-937 (1/97)                                                                                   ORI 00109

**OPD ADDITIONAL INFORMATION REPORT**

OAKLAND POLICE DEPARTMENT
455 - 7th Street
Oakland, CA 94607

RD # 004-4120

| CRIME 187 P.C | [ ] SUPPLEMENTAL | INCIDENT # 70 | V1 | VICTIM LAST, First, Mid. BROWN, GERALD |
| SUSPECT LAST, First, Mid. UNK | | INCIDENT LOCATION IFO 5555 BANCROFT AVE | DATE OF THIS REPORT 15 MAY 00 | ORIGINAL DATE REPORTED |

ITEM #  QUANTITY   ITEM   PROPERTY ITEM NARRATIVE   SERIAL #   VALUE

SUMMARY CONT: OFC C. BOLTON 8296P RESPONDED TO 5555 BANCROFT

AVE #B AND SPOKE TO MELTON, CARNELL WHO SAID BROWN WAS

INSIDE OF THE APARTMENT LOCATED AT 5555 BANCROFT AVE #B AT

ABOUT 2100 HRS OR 2200 HRS. MELTON SAID SHE WENT TO SLEEP

AND DID NOT HEAR ANY GUN SHOTS OR ARGUING OUTSIDE. MELTON

SAID SHE WAS AWAKEN BY BOATLEY INFORMING HER THE POLICE

WAS OUTSIDE. OFC C. BOLTON 8296P TOOK A WRITTEN STATEMENT

FROM MELTON, CARNELL.

SEE OFC BILEINZKOFF 8011P, OFC B. ORTIZ 8132P, OFC D. WARD 8293P

OFC N. CERECEDES 8275P FOR CANVASS RESULTS.

TECH A. COOGLER 4312P RESPONDED AND PROCESSED THE SCENE.

SEE HER TECH REPORT FOR DETAILS OF THE SCENE AND RELEVANT

EVIDENCE.

SGT GRIMES, RESPONDED TO THE SCENE, COORDINATED THE ACTIVITIES

OF RESPONDING OFFICERS, AND CALLED OUT THE HOMICIDE INVESTIGATORS

SGTS CRUZ AND MEDEIROS.

TECH J. OARE RESPONDED TO SCENE

MY INVESTIGATION REVEALED BROWN WAS SHOT NUMERUS

TIMES BY AN UNK SUSPECT. BROWN WAS TRANSPORTED TO

ACH WHERE HE PRONOUNCED DEAD A 01:16HRS BY DR

VREELAND.

| REPORTED BY D. THURSTON | SERIAL # 8262P | WATCH 1 | DISTRICT 5 | SUPERVISOR LT. WILLIAMS | SERIAL # | PAGE 6 OF 8 |

536-937 (1/97)

**O.P.D** *POLICE REPORT*

*Victim Witness*

**Oakland Police Department**
455 - 7th Street
Oakland, CA 94607

RD # 00-14120

| CRIME | INCIDENT NO. | | VICTIM LAST, First, Mid. | [ ] Business Name |
|---|---|---|---|---|
| 187 P.C. | 70 | V1 | BROWN, GERALD | |

**ADDITIONAL PERSONS:** CLASS: V    W    R/P    LINKED TO: V    R/P    W    S

| | LAST, First, Mid | [ ] Business Name | | | SEX | RACE | D.O.B. | | AGE |
|---|---|---|---|---|---|---|---|---|---|
| | ONEAL, LATACHA | | | | F | B | | | |

| HOME ADDRESS | CITY | [X] OAKLAND | ZIP | HOME PHONE |
|---|---|---|---|---|
| 5601 HILTON ST | | | | |

| BUSINESS ADDRESS / SCHOOL | CITY | [ ] OAKLAND | ZIP | WORK PHONE |

| OCCUPATION | WORKING HOURS | D.L. NUMBER /STATE |

| VICTIM ACTIVITY: (Check That Apply) | [ ] AT HOME [ ] AT WORK | [ ] ON STREET [ ] ON VACATION | [ ] IN HOSPITAL [ ] IN JAIL | [ ] WALKING [ ] JOGGING | [ ] DRIVING [ ] SLEEPING | [ ] AT SCHOOL [ ] AT PARK | [ ] SHOPPING CNTR |

| | LAST, First, Mid | [ ] Business Name | | SEX | RACE | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|
| | O. F. D    # 2558 | | | | | | |

| HOME ADDRESS | CITY | [ ] OAKLAND | ZIP | HOME PHONE |
| BUSINESS ADDRESS / SCHOOL | CITY | [ ] OAKLAND | ZIP | WORK PHONE |
| OCCUPATION | WORKING HOURS | D.L. NUMBER/STATE |

| VICTIM ACTIVITY: (Check All That Apply) | [ ] AT HOME [ ] AT WORK | [ ] ON STREET [ ] ON VACATION | [ ] IN HOSPITAL [ ] IN JAIL | [ ] WALKING [ ] JOGGING | [ ] DRIVING [ ] SLEEPING | [ ] AT SCHOOL [ ] AT PARK | [ ] SHOPPING CNTR |

| | LAST, First, Mid | [ ] Business Name | | SEX | RACE | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|
| | AMR    # 501 | | | | | | |

| HOME ADDRESS | CITY | [ ] OAKLAND | ZIP | HOME PHONE |
| BUSINESS ADDRESS / SCHOOL | CITY | [ ] OAKLAND | ZIP | WORK PHONE |
| OCCUPATION | WORKING HOURS | D.L. NUMBER/STATE |

| VICTIM ACTIVITY: (Check All That Apply) | [ ] AT HOME [ ] AT WORK | [ ] ON STREET [ ] ON VACATION | [ ] IN HOSPITAL [ ] IN JAIL | [ ] WALKING [ ] JOGGING | [ ] DRIVING [ ] SLEEPING | [ ] AT SCHOOL [ ] AT PARK | [ ] SHOPPING CNTR |

| | LAST, First, Mid | [ ] Business Name | | SEX | RACE | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|
| | B. ORTIZ    8132 P | | | | | | |

| HOME ADDRESS | CITY | [ ] OAKLAND | ZIP | HOME PHONE |
| BUSINESS ADDRESS / SCHOOL | CITY O. P. D | [ ] OAKLAND | ZIP | WORK PHONE |
| OCCUPATION | WORKING HOURS | D.L. NUMBER/STATE |

| VICTIM ACTIVITY: (Check All That Apply) | [ ] AT HOME [ ] AT WORK | [ ] ON STREET [ ] ON VACATION | [ ] IN HOSPITAL [ ] IN JAIL | [ ] WALKING [ ] JOGGING | [ ] DRIVING [ ] SLEEPING | [ ] AT SCHOOL [ ] AT PARK | [ ] SHOPPING CNTR |

| | LAST, First, Mid | [ ] Business Name | | SEX | RACE | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|
| | D. VANTREE    8198 P | | | | | | |

| HOME ADDRESS | CITY | [ ] OAKLAND | ZIP | HOME PHONE |
| BUSINESS ADDRESS / SCHOOL | CITY O. P. D | [ ] OAKLAND | ZIP | WORK PHONE |
| OCCUPATION | WORKING HOURS | D.L. NUMBER/STATE |

| VICTIM ACTIVITY: (Check All That Apply) | [ ] AT HOME [ ] AT WORK | [ ] ON STREET [ ] ON VACATION | [ ] IN HOSPITAL [ ] IN JAIL | [ ] WALKING [ ] JOGGING | [ ] DRIVING [ ] SLEEPING | [ ] AT SCHOOL [ ] AT PARK | [ ] SHOPPING CNTR |

| REPORTED BY | SERIAL # | WATCH | DISTRICT | SUPERVISOR | SERIAL # | PAGE 7 OF 8 |
|---|---|---|---|---|---|---|
| D THURSTON | 8262P | 1 | 5 | LT. WILLIAMS | | |

# O P D POLICE REPORT

**Victim Witness**

Oakland Police Department
455 - 7th Street
Oakland, CA 94607

RD # 0044120

| CRIME | INCIDENT NO. | | VICTIM LAST, First, Mid. | [ ] Business Name |
|---|---|---|---|---|
| 187. P.C. | 70 | V1 | BROWN, GERALD | |

| ADDITIONAL PERSONS | CLASS: | V | W | R/P | LINKED TO: | V | R/P | W | S |
|---|---|---|---|---|---|---|---|---|---|

| CLASS | LINKED TO: | LAST, First, Mid | [ ] Business Name | SEX | RACE | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|
| R/P | V | SGT GRIMES | | | | | |

HOME ADDRESS — CITY [ ] OAKLAND — ZIP — HOME PHONE

BUSINESS ADDRESS / SCHOOL — CITY O.P.D [ ] OAKLAND — ZIP — WORK PHONE

OCCUPATION — WORKING HOURS — D.L. NUMBER /STATE

| VICTIM ACTIVITY: (Check All That Apply) | [ ] AT HOME [ ] AT WORK | [ ] ON STREET [ ] ON VACATION | [ ] IN HOSPITAL [ ] IN JAIL | [ ] WALKING [ ] JOGGING | [ ] DRIVING [ ] SLEEPING | [ ] AT SCHOOL [ ] AT PARK | [ ] SHOPPING CNTR |
|---|---|---|---|---|---|---|---|

| CLASS | LINKED TO: | LAST, First, Mid | [ ] Business Name | SEX | RACE | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|
| R/P | W | OFC D WARD 8293 P | | | | | |

HOME ADDRESS — CITY [ ] OAKLAND — ZIP — HOME PHONE

BUSINESS ADDRESS / SCHOOL — CITY O.P.D [ ] OAKLAND — ZIP — WORK PHONE

OCCUPATION — WORKING HOURS — D.L. NUMBER/STATE

| VICTIM ACTIVITY: (Check All That Apply) | [ ] AT HOME [ ] AT WORK | [ ] ON STREET [ ] ON VACATION | [ ] IN HOSPITAL [ ] IN JAIL | [ ] WALKING [ ] JOGGING | [ ] DRIVING [ ] SLEEPING | [ ] AT SCHOOL [ ] AT PARK | [ ] SHOPPING CNTR |
|---|---|---|---|---|---|---|---|

| CLASS | LINKED TO: | LAST, First, Mid | [ ] Business Name | SEX | RACE | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|
| R/P | V | TECH CODGLER | | | | | |

HOME ADDRESS — CITY [ ] OAKLAND — ZIP — HOME PHONE

BUSINESS ADDRESS / SCHOOL — CITY [ ] OAKLAND — ZIP — WORK PHONE

OCCUPATION — WORKING HOURS — D.L. NUMBER/STATE

| VICTIM ACTIVITY: (Check All That Apply) | [ ] AT HOME [ ] AT WORK | [ ] ON STREET [ ] ON VACATION | [ ] IN HOSPITAL [ ] IN JAIL | [ ] WALKING [ ] JOGGING | [ ] DRIVING [ ] SLEEPING | [ ] AT SCHOOL [ ] AT PARK | [ ] SHOPPING CNTR |
|---|---|---|---|---|---|---|---|

| CLASS | LINKED TO: | LAST, First, Mid | [ ] Business Name | SEX | RACE | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

HOME ADDRESS — CITY [ ] OAKLAND — ZIP — HOME PHONE

BUSINESS ADDRESS / SCHOOL — CITY [ ] OAKLAND — ZIP — WORK PHONE

OCCUPATION — WORKING HOURS — D.L. NUMBER/STATE

| VICTIM ACTIVITY: (Check All That Apply) | [ ] AT HOME [ ] AT WORK | [ ] ON STREET [ ] ON VACATION | [ ] IN HOSPITAL [ ] IN JAIL | [ ] WALKING [ ] JOGGING | [ ] DRIVING [ ] SLEEPING | [ ] AT SCHOOL [ ] AT PARK | [ ] SHOPPING CNTR |
|---|---|---|---|---|---|---|---|

| CLASS | LINKED TO | LAST, First, Mid | [ ] Business Name | SEX | RACE | D.O.B. | AGE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

HOME ADDRESS — CITY [ ] OAKLAND — ZIP — HOME PHONE

BUSINESS ADDRESS / SCHOOL — CITY [ ] OAKLAND — ZIP — WORK PHONE

OCCUPATION — WORKING HOURS — D.L. NUMBER/STATE

| VICTIM ACTIVITY: (Check All That Apply) | [ ] AT HOME [ ] AT WORK | [ ] ON STREET [ ] ON VACATION | [ ] IN HOSPITAL [ ] IN JAIL | [ ] WALKING [ ] JOGGING | [ ] DRIVING [ ] SLEEPING | [ ] AT SCHOOL [ ] AT PARK | [ ] SHOPPING CNTR |
|---|---|---|---|---|---|---|---|

| REPORTED BY | SERIAL # | WATCH | DISTRICT | SUPERVISOR | SERIAL # | PAGE 8 OF 8 |
|---|---|---|---|---|---|---|
| D. THURSTON | 8262P | 1 | 5 | LT. WILLIAMS | | |

TF-3042 (4NOV94)

ORI 00109

# EXHIBIT COVER PAGE

E

EXHIBIT

Description of this Exhibit: supreme court of califorina denial

Number of pages to this Exhibit: ___1___ pages.

JURISDICTION: (Check only one)

- ☐ Municipal Court
- ☐ Superior Court
- ☐ Appellate Court
- ☐ State Supreme Court
- ☒ United States District Court
- ☐ State Circuit Court
- ☐ United States Supreme Court
- ☐ Grand Jury

S155456

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re ERIC LOCKHART on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

George, C. J., was absent and did not participate.

SUPREME COURT
**FILED**

JAN 3 0 2008

Frederick K. Ohlrich Clerk

---

Deputy

**BAXTER**

Acting Chief Justice

# EXHIBIT COVER PAGE

F

EXHIBIT

Description of this Exhibit: **UNITED STATE DISTRICT COURT/ NORTHERN DISTRICT OF CALIFORNIA: ORDER OF DISMISSAL**

Number of pages to this Exhibit: ___3___ pages.

JURISDICTION: (Check only one)

☐ Municipal Court
☐ Superior Court
☐ Appellate Court
☐ State Supreme Court
☒ United States District Court
☐ State Circuit Court
☐ United States Supreme Court
☐ Grand Jury



ORIGINAL
FILED

APP 0 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1

2

3

4

5

6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

ERIC LOCKHART,                          )    No. C 07-5762 JSW (PR)
                                        )
10              Petitioner,             )
                                        )    **ORDER OF DISMISSAL**
11      vs.                             )
                                        )
12  TONY HEDGEPETH, Warden,             )
                                        )    (Docket No. 4)
13              Respondent.             )
                                        )
14  _____)

15

16

Petitioner, a prisoner of the State of California, currently incarcerated at Pelican

17

Bay State Prison, has filed a habeas corpus petition pursuant to 28 U.S.C. § 2254

18

challenging his 2003 state court conviction for murder with special circumstances.

19

Petitioner states that at the time he filed the instant federal habeas petition, he had a

20

petition, appeal, or other post-conviction proceeding pending in the California Supreme

21

Court. (Petition at 5.)

22

This Court may entertain a petition for a writ of habeas corpus "in behalf of a

23

person in custody pursuant to the judgment of a State court only on the ground that he is

24

in custody in violation of the Constitution or laws or treaties of the United States." 28

25

U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). A district court shall "award

26

the writ or issue an order directing the respondent to show cause why the writ should not

27

be granted, unless it appears from the application that the applicant or person detained is

28

not entitled thereto." 28 U.S.C. § 2243. Summary dismissal is appropriate only where

1    the allegations in the petition are vague, conclusory, palpably incredible, or patently

2    frivolous or false. *See Hendricks v. Vasquez*, 908 F.2d 490, 491 (9th Cir. 1990) (citing

3    *Blackledge v. Allison*, 431 U.S. 63, 75-76 (1977)).

4        The exhaustion requirement applicable to federal habeas petitions is not satisfied if

5    there is a pending post-conviction proceeding in state court. *See* 28 U.S.C. § 2254(b)-(c);

6    *Sherwood v. Tomkins*, 716 F.2d 632, 634 (9th Cir. 1983). If a post-conviction challenge

7    to a criminal conviction is pending in state court, a potential federal habeas petitioner

8    must await the outcome of that challenge before his state remedies are considered

9    exhausted. *See id.* This rule applies irrespective of whether the issue raised in the

10    pending state petition is included in the federal petition, for the reason that a pending state

11    court challenge may result in a reversal of the petitioner's conviction, thereby mooting the

12    federal petition. *See id.* (citations omitted).

13        As Petitioner has a petition, appeal or other post-conviction proceeding pending in

14    the California Supreme Court, the instant petition for a writ of habeas corpus is hereby

15    DISMISSED, without prejudice to Petitioner's refiling his claims after all state court

16    post-conviction challenges to petitioner's conviction have been completed and all claims

17    petitioner wishes to raise in federal court have been exhausted in accordance with

18    28 U.S.C. § 2254(b)-(c). See Rose v. Lundy, 455 U.S. 509, 522 (1982) (holding every

19    claim raised in federal habeas petition must be exhausted).

20        In light of petitioner's lack of funds, the application to proceed in forma pauperis

21    is hereby GRANTED.

22        The Clerk shall close the file. This order terminates Docket No. 4.

23        IT IS SO ORDERED.

24    DATED: April 3, 2008

                                        JEFFREY S. WHITE
                                        United States District Judge

2

1                          UNITED STATES DISTRICT COURT

2                                 FOR THE

3                    NORTHERN DISTRICT OF CALIFORNIA

4

5

6 ERIC LOCKHART,                         Case Number: CV07-05762 JSW

7            Plaintiff,                 **CERTIFICATE OF SERVICE**

8     v.

9 TONY HEDGPETH et al,

10            Defendant.
                                    /

11

12 I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

13 That on April 3, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing

14 said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

15

16

17 Eric Lockhart V-17246
Kern Valley State Prison

18 P.O. Box 5102
Delano, CA 93216

19

20 Dated: April 3, 2008                    *Jennifer Ottolini*
                                   Richard W. Wieking, Clerk

21                                      By: Jennifer Ottolini, Deputy Clerk

22

23

24

25

26

27

28